IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NAFIZ WATKINS,
    Plaintiff

    -v-

BALTIMORE CITY, STEVEN T. MOYER, ROBERT GREEN, MICHAEL
RESNICK, DIONNE RANDOLPH, TYRELL WILSON, THOMAS WILLIAMS,
FATIMA PATTERSON, NORMAN HAWKINS, KEVIN HICKSON, SHAWANDA
JACKSON, GERALD SOLOMON, SERGEANT ATIKPOH, JOHN DOE CORRECTION-
AL OFFICER, JANE DOE CORRECTIONAL OFFICER, IESHA BUTLER, ELLICE HALL,
BOBBY ALLEN, RONALD CRAWFORD, DAVON TELP, KEMAR HINES, CORRECTIONAL
OFFICER THOMAS, CORRECTIONAL OFFICER POWELL, CORRECTIONAL OFFICER NUFEA
SERGEANT BRYANT, WEXFORD HEALTH SOURCES, INC., OLUYEMI ABIODUN, THE
MEDICAL DIRECTOR OF BALTIMORE CITY BOOKING AND INTAKE CENTER, MULUGETA
AKAL, THE MEDICAL DIRECTOR OF MARYLAND RECEPTION DIAGNOSTIC AND
CLASSIFICATION CENTER, OLUFEMI OLAWALE, CORIZON HEALTH, LUM MAXIMUAGU,
CANDICE R. CRIST, KELLY BICKFORD, CRYSTAL JAMISON, MUNJANJA LITELL, ERWIN
ALDANA, SHARON BAUCOM, UTILIZATION MANAGEMENT REVIEW PANEL, THE
ASSISTANT WARDEN OF MARYLAND CORRECTIONAL INSTITUTION-HAGERSTOWN,
JANE DOE DISPENSARY NURSES AT EASTERN CORRECTIONAL INSTITUTION, RUTH
CAMPBELL, BRUCE FORD, SARAH JOHNSON, MARIE DESIR, PAUL MATERA, CLAYTON
RAAB, DEBORAH TABULOU, JASON CLEM, TALMADGE REEVES, WALTER WEST, WAYNE
HILL, MONICA STALLWORTH, MAKSED CHOUDRY, JANE DOE DISPENSARY
NURSES AT ROXBURY CORRECTIONAL INSTITUTION, THE CORRECT RX
PHARMACY SERVICES, INC., CASEY CAMPBELL, and THE DEPUTY
CORPORATE MEDICAL DIRECTOR, Sued in their individual and
official capacities
        Defendants.

FILED ____ ENTERED
LODGED ____ RECEIVED

MAR 1 9 2021

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____ DEPUTY

PROPOSED AMENDED COMPLAINT WITH DEMAND FOR JURY TRIAL

# I. JURISDICTION & VENUE

1). This is a civil action authorized by 42 U.S.C. section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States and secured by Acts of Congress providing for equal rights of persons within the jurisdiction of the United States. The Court has jurisdiction under 28 U.S.C. section 1331 and 1343(a)(3). The Court has supplemental jurisdiction over the plaintiff's state law tort claims under 28 U.S.C section 1367. The plaintiff seeks declaratory relief pursuant to 28 U.S.C section 2201 and 2202. The Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2). The DISTRICT of MARYLAND is an appropriate venue under 28 U.S.C. section 1391 (b)(2) because it is where the events giving rise to this claim occurred.

# II. PLAINTIFF

3). The Plaintiff, Nafiz Watkins, has been incarcerated at Baltimore City Booking and Intake Center ("BCBIC"), Maryland Reception Diagnostic and Classification Center ("MRDCC"), Maryland Correctional Institution-Hagerstown ("MCI-H"), Eastern Correctional Institution ("ECI"), and Roxbury Correctional Institution ("RCI") during the events described in this complaint.

# III. DEFENDANTS

4). Defendant Steven T. Moyer is the former Secretary of the Department of Public Safety and Correctional Services and was responsible for the overall operation of the Department and each unit under its jurisdiction including the Division of Pre-trial Detention and Services, The Division of Correction, and the Correctional Training Commission. He is sued in his individual and official capacity.

5). Defendant Robert Green is the current Secretary of The Department of Public Safety and

Correctional Services and is currently responsible for the overall operation of the Department and each unit under its Jurisdiction. He is sued in his individual and official capacity.

6) Defendant Michael Resnick is the Commissioner of The Division of Pre-trial Detention and Services and is legally responsible for the overall operation of ("DPDS") and each facility under its Jurisdiction. He has a duty to keep safely all inmates committed to his custody. He is sued in his individual and official capacity.

7) Defendant Dionne Randolph was, at all relevant times, The Acting Warden of Baltimore City Booking and Intake Center ("BCBIC") and was responsible for reviewing all administrative appeals of disciplinary charges filed by BCBIC inmates. She was also responsible for the operation of BCBIC and for the welfare of all inmates in that facility. She is sued in her individual and official capacity.

8) Defendant Tyrell Wilson was, at all relevant times, The Acting Assistant Warden of BCBIC for security and was in charge of the supervision and discipline of all correctional staff at BCBIC. He is sued in his individual and official capacity.

9) Defendant Thomas Williams is a Hearing Officer who, at all relevant times, was responsible for conducting disciplinary hearings for prisoners accused of breaking prison rules. He is sued in his individual and official capacity.

10) Defendants Fatima Patterson and Norman Hawkins were, at all relevant times, Correctional Lieutenants assigned to BCBIC. They are sued in their individual and official capacities.

11) Defendant Kevin Hickson was, at all relevant times, a Correctional Sergeant who was generally in charge of the Emergency response Team/Tactical Unit. He is sued in his individual and official Capacity.

12) Defendants Shawanda Jackson, Gerald Solomon, and Sergeant Atik Poh were, at all relevant times, Correctional Sergeants assigned to BCBIC. They are sued in their individual and official capacities.

13) Defendant John Doe, whose name is believed to be Correctional Officer Butler, was at all relevant times, a correctional Officer assigned to BCBIC. He is sued in his individual and official capacity.

14). Defendant Jane Doe, whose name is presently unknown, was at all relevant times, The Institutional Representative for BCBIC during disciplinary hearings. She is sued in her individual and Official capacity.

15). Defendants Iesha Butler, ELL Ice Hall, Bobby Allen, Ronald Crawford, Davon Telp, and Correctional officer Thomas were, at all relevant times, Correctional officers assigned to BCBIC. They are sued in their individual and Official capacities.

16). Defendant Lemar Hines was, at all ~~other~~ relevant times, a Correctional Captain assigned to BCBIC. He is sued in his individual and Official capacity.

17). Defendants Powell and Nufea were, at all relevant times, Correctional Officers assigned to the Court Transportation Unit. They are sued in their individual and Official capacities.

18). Defendant Sergeant Bryant was, at all relevant times, The Supervisor of the Court Transportation Unit. She is sued in her individual and Official capacity.

19). Defendant Wexford Health Sources, Inc. is a private Health Care provider that was formerly under contract with the State of Maryland to provide medical care and services to the state's inmates and detainees, including Nafiz Watkins. It is sued in its Official Capacity.

20). Defendant OLuyemi Abiodun is a Medical doctor who, at all relevant times, was employed by Wexford Health Sources, Inc. She is sued in her individual and Official capacity.

21). Defendant Medical Director of BCBIC, whose name is currently unknown, was generally responsible for ensuring provision of medical care to detainees at BCBIC and was, at all relevant times, employed by Wexford Health Sources, Inc. He/she is sued in his/her individual and Official capacity.

22). Defendant Mulugeta Athal is a Medical doctor who, at all relevant times, was employed by Wexford Health Sources, Inc. He is sued in his individual and Official capacity.

23). Defendant Medical Director of MRDCC, whose name is currently unknown, was generally responsible for ensuring provision of medical care to prisoners at MRDCC and specifically for scheduling medical appointments outside the prison when a prisoner needs specialized treatment or evaluation. He/she is sued in his/her individual and Official capacity.

24). Defendant Baltimore City is the local government that is responsible for the pre-trial Population at BCBIC and MRDCC. It is sued in its Official capacity.

25). Defendant Olufemi Olawale is a Nurse Practitioner who, at all relevant times, was employed by Wexford Health Sources, Inc. He is sued in his individual and Official capacity.

26). Defendant Corizon Health is a private Health Care provider that is Currently under Contract with the State of Maryland to provide medical care and Services to the state's inmates, including Nafiz Watkins. It is sued in its Official capacity.

27). Defendant Lum Maximvangu is a Nurse Practitioner who, at all relevant times, was employed by Wexford Health Sources, Inc and Corizon Health. She is sued in her individual and Official capacity.

28). Defendant Kelly Bickford is a registered nurse who, at all relevant times, was employed by Wexford Health Sources, Inc. and Corizon Health. She is sued in her individual and Official capacity

29). Defendant Crystal Jamison is a Physician's Assistant who, at all relevant times, was employed by Wexford Health Sources, Inc. and now Corizon Health. She is sued in her individual and Official capacity.

30). Defendant MunJanJa Litell is a Nurse Practitioner who, at all relevant times, was employed by Wexford Health Sources, Inc and Corizon Health. She is sued in her individual and Official capacity.

31). Defendant Candice R. Crist is a Medical doctor who, at all relevant times, was employed by Meritus Medical Center. She is sued in her individual and Official capacity.

32). Defendant Erwin Aldana, is currently The Corizon Regional Medical Director and was, at all relevant times, generally responsible for ensuring provision of medical care to prisoners and specifically for scheduling medical appointments outside the prison when a prisoner needs specialize treatment or evaluation. He is sued in his individual and Official capacity.

33). Defendant Sharon Baucom is the Director of Clinical Services and The Chief Medical Officer of The Department of Public Safety and Correctional Services. She is sued in her individual and Official capacity.

34). Defendant Utilization Management Review Panel, whose members are currently unknown, are involved in the Utilization Management Process regarding off-site specialty care procedures and documentation. They are sued in their individual and Official capacities.

35). Defendant Assistant Warden of MCI-H, whose name is currently unknown, was in charge of transportation of prisoners to medical appointments. He/she is sued in his/her individual and official capacity.

36) Defendant Jane Doe Dispensary nurses, whose names are currently unknown, were at all relevant times, employed by Corizon Health and assigned to ECI. They are sued in their individual and official capacities.

37) Defendants Ruth Campbell and Bruce Ford are physician's Assistants who, at all relevant times, were employed by Corizon Health. They are sued in their individual and official capacities.

38) Defendants Sarah Johnson and Marie Desir are both Registered nurses who, at all relevant times, were employed by Corizon Health. They are sued in their individual and official capacities.

39) Defendants Paul Matera and Clayton Baab are Medical doctors who, at all relevant times, were employed by Corizon Health. They are sued in their individual and official capacities.

40). Defendant Deborah Tabulov is a nurse practitioner who, at all relevant times, was employed by Corizon Health. She is sued in her individual and official capacity.

41). Defendant Jason Clem was, at all relevant times, The medical director of ECI. He was generally responsible for ensuring provision of medical care to prisoners and specifically for scheduling medical appointments outside the prison when a prisoner needs specialized treatment or evaluation. He is sued in his individual and official capacity.

42). Defendant Walter West was, at all relevant times, The Warden of ECI and was responsible for the operation of ECI and the welfare of all inmates in that prison. He is sued in his individual and official capacity.

43). Defendants Monica Stallworth and Mahsed Choudry are both medical doctors employed by Corizon Health. They are sued in their individual and official capacities.

44). Defendants Jane Doe Dispensary nurses, whose names are currently unknown, were at all relevant times employed by Corizon Health and assigned to RCI. They are sued in their individual and official capacities.

45). Defendant The Correct Rx Pharmacy Services, Inc. is responsible for filing the Providers of Corizon Health's Orders for prescription medication. It is sued in its official capacity

46). Defendant Deputy Corporate Medical director, whose name is currently unknown, is employed by Corizon Health. He/she is sued in his/her individual and official capacity.

47). Defendant Casey Campbell is the Warden of RCI and is responsible for the operation of RCI and the Welfare of all inmates at RCI. He is sued in his individual and official capacity

48). Defendant Wayne Hill is the former Commissioner of The Division of Correction who, at all relevant times, was legally responsible for the overall operation of The Division and each institution under its jurisdiction. He is sued in his individual and official capacity.

49). All the defendants have acted, and some continue to act, under the color of state law at all times relevant to this Complaint.

## IV. FACTUAL STATEMENT

50). On October 19, 2017, I was arrested and detained at The Baltimore City Booking and Intake Center ("BCBIC")

51). Shortly after my arrest, I mailed a letter to the Clerk of the United States District Court for the District of Maryland, informing the Court that my address was BCBIC's address

52). This was done because prior to my arrest, I filed a civil action Pursuant to 42 U.S.C.§ 1983 in this court under case #CCB-17-2893 for an incident in which I was placed in close proximity to the same man who had attempted to murder me in 2015 and was, at that time, incarcerated and facing attempted murder and other charges in which I was the Victim/Witness.

53). The case listed the Warden of MTC, a Lt. Patterson, a Major Vincent, Wexford Health Sources, Inc., and others as defendants. That case, at the time, was in its preliminary stages and had not developed yet.

54). On October 30, 2017, I suspiciously received an infraction stating that I threatened Iesha Butler as she was working my tier. These False and Trumped-up charges stated that I said I would slap this officer when I see her on the outside, that I also threatened to have

her slapped, that I refused to step inside my cell, and that I became disrespectful and started cursing at this officer all because she told me to remove myself from the officer's desk. Of note is the fact that no call for emergency assistance is called.

55). The notice of inmate Rule violation was served by this Officer's shift Supervisor and Shift Commander, which were Norman Hawkins and Fatima Patterson.

56). Upon service of the notice, after I requested the video surveilance, I requested to get the names and cell numbers of the witnesses I wanted to call for the hearing I would get. I was told by Fatima Patterson and Norman Hawkins that I would be given an opportunity later to get these witnesses. However, I was never given the chance.

57). I was made to then pack my property, in order to be moved to the floor where inmates are housed on Administrative segregation pending a formal hearing.

58). When me and the "supervisors" reached the floor used to house Administrative Segregation inmates, I immediately recognized some of my enemies. I then informed the "supervisors" at which point, Fatima Patterson became irate and started yelling and cursing at me, saying, "your little punk ass is lying and you are going in that cell either willingly or by force."

59). At this point, I then informed the "supervisors" that the enemies I am seeing are family members of the man who shot me. I informed them also that he is now on my enemy list because after he was arrested for my attempted murder, we were placed in close proximity to one another which led to us fighting and me getting injured. I also told them that if they called Captain Giles of the internal investigation unit, my statement could be verified.

60). These "supervisors" called someone, presumably Captain Giles, because after they got off the phone, they moved me to a different floor even though they were not happy about it. Fatima Patterson stated, "you skated this time". I then told her I did not commit the allegations in the infraction but for some reason, she refused to be convinced and the false and trumped-up charges were left pending against me.

61). On November 20, 2017, I was sent to BCBIC's sallyport to be transported to court. Upon being ordered to enter the Transportation Van, we were not placed in seatbelts by staff.

62). During the return from court, we were still not placed in seatbelts by staff. Due to the

reckless driving of Defendant Powell, when we turned off of Madison street into BCBIC's sallyport, the stepping stool smacked my leg, lodged itself against my leg, and then the whole second row seat collapsed on my legs with inmates ~~still~~ sitting on it.

63)  Since we had to wait to be cleared to enter BCBIC, I had to remain in this painful position for about 10-15 minutes. After we gained entry, and only after the officers put away their weapons did Officer Powell climb into the Van and lift the broken seat off me. I was then taken to medical by Defendant Powell who confirmed that I was injured in the Transportation Van as described

64)  On November 21, 2017, I filed a grievance with the Residential Grievance Office describing the Transportation Van incident and seeking damages against various officials for the injuries I sustained. I also filed a Notice of claim with the State Treasurer.

65)  On November 23, 2017, I received another Trumped-up false charge of engaging in a disruptive act among other Rule violations. The charges stated that I pointed at a Sergeant Atik Poi and made a firing sound. This notice of rule violation was served by Defendant Gerald Solomon and someone else. These officials stated that because I now had two pending infractions, I was to be taken out of the dormitory and put back in a cell on Administrative Segregation pending a hearing. ~~████~~

66)  Upon arriving on the floor used to house inmates on Administrative Segregation status, I was placed in cell 27 which was the tier worker's cell because there were no other cells available.

67)  After about a day or two, I started being allowed to clean the tier and assist in feeding the other inmates.

68)  After a couple days of working, one night Staff approached my cell asking me or my cell mate to come out and clean the Staff's bathroom.

69)  I volunteered to clean the restroom for the male staff member. Once I stepped into the hallway, I noticed Defendant Iesha Butler was the other staff member on duty. When she saw me, she stated, "Why is he a worker? I don't want him cleaning anything". To prevent another incident, I immediately retreated back to my cell and my cell mate went and cleaned the Staff's bathroom instead.

70)  A day or two later, I was out on the tier cleaning up. Defendant Thomas, who was

assigned to the Post outside the tier, called me into the hallway and asked me, "Who hir you and told you that you could work??" I then informed her that our tier officers have bee letting me work for the past couple days. I also informed her that when Sergeant Poteat, the one responsible for hiring, made her rounds, she approved my cleaning of the tier and allowed me to be able to continue working.

71). Defendant Thomas then told me that she ~~decides~~ decides who works on "her tie She then made a phone call to master control and told me to pack my property. After she got off the phone she told me to move to cell 36 and told me I would not be allowed to work anymore because of my pending Trumped-up charges.

72). As I was moving my property into cell 36, I noticed that a grate had been welded to my window and there were metal shavings all around the window area and my bed. There was also dust and mold coming out and blocking the ventilation system in my cell I immediately informed Defendants Thomas and Hall about the conditions of my cell but was told to stop complaining.

73) On November 30, 2017, I was taken to medical for breathing complications and chest pains due to being exposed to the unsanitary conditions of my cell.

74). Since I have asthma and was having trouble breathing, I was put on nebulizer treatment and then prescribed this treatment, as needed, from November 30, 2017 — December 30, 2017. Medical also prescribed nasal spray and requested that I be transferred to a dormitory setting however, I was told by staff that "custody" denied the transfer because of the two trumped-up charges that were still pending against me.

75) On December 1, 2017, I filed a number of grievances with the residential grievance office about the unsanitary conditions of my cell and the fact that I was being denied my right to work and earn local credits and participate in Jumuah services. These grievances list the Warden and others as liable and seeks damages against them.

76) On December 2, 2017, I requested to go to medical after recreation was over because while being locked in this cell with its unsanitary provisions, I was still having trouble breathing and chest pains and my inhaler nor my nasal spray were helping me.

77) The tier officer, defendant Ellice Hall, told me to stop complaining and go "lock in". I then told this officer that all she had to do was call medical because I was prescribed treatment with nebulizer "as needed".

78) Defendant Hall refused to call medical or send me to medical for my prescribed treatment. I then asked to speak to her supervisor and she called Defendant Shawanda Jackson.

79) When defendant Jackson arrived, I made my request again to go to medical for my prescribed treatment. Defendant Jackson told me my request to go to medical was denied. I also requested the inmate statement and matter of record that was filed on November 20, 2017 pertaining to the transportation van incident but was denied these requests also.

80) I then asked defendant Jackson to speak to her supervisor yet she denied this request also. She then told me, "I am all you will see, I aint calling anyone".

81) She then threatened to mace me if I didn't "lock-in", I ignored her threat and repeated my request to speak with her supervisor and/or allow me my prescribed treatment.

82) Defendant Jackson instead called Defendants Davon Telp, Ronald Crawford, Bobby Allen, Gerald Solomon, Kemar Hines, and a John Doe Correctional officer whose last name is believed to be butler. It is believed these officers were acting as the emergency response team/tactical unit.

83) Without warning, defendants Telp, Crawford, Allen, Solomon, Hines, and the John Doe Correctional Officer forcibly grabbed me and lifted me in the air, carrying me to the cell from the table I was sitting at. While these defendants had both my arms restrained against the doorway of my cell, one of them came behind me and kicked me in my right thigh, reinjuring my femur.

84) During the assault, Defendants Hall and Jackson watched the assault taking place while laughing and did not intervene.

85) Upon information and belief, Sergeant Kevin Hickson was the emergency

response team/tactical unit's supervisor who regularly allowed his subordinates to assault inmates they believed had cooperated with Baltimore City Police. It is believed that the facts that gave rise to me filing civil action #CCB-17-2893 coupled with the fact that, at that time, I was a victim/witness in a pending attempted murder case, led to officials positively confirming that I too cooperated with Baltimore City Police.

86).   It is also believed that some of Kevin Hickson's subordinates would brag on social media about the number of inmate assaults they were criminally committing with reckless disregard for the consequences.

87).   After I was kicked, I showed defendants Telp, Crawford, Allen, Solomon, Hines, and the John Doe officer, whose name is believed to be butler, how they had disfigured my leg and that I needed to go to medical. The bone and/or rod in my femur was protruding and clearly visible. I also informed them that I could barely walk

88).   Once defendants Telp, Crawford, Allen, Solomon, hines, and the John Doe officer saw what they did to my leg, these defendants left my cell and closed the door on me, refusing to allow me to be taken to medical.

89).   I then called defendants Hall and Jackson to my door showing them my leg, telling them that I was in pain and could not walk, and asking them to send me to medical, ~~I ademed adoeed~~ because I was just kicked in my femur. Once defendants Hall and Jackson saw the damage caused by the emergency response team/tactical unit to my leg, they refused to send me to medical as well.

90).   I had a panic/Asthma attack on the next shift around 6:00 pm due to being afraid of what would happen to me next or what to do about my leg and the pain I was made to endure, combined with my cell's unsanitary provisions.

91).   A medical emergency was called and I was taken to medical in a wheelchair. When I got there, I was seen by Defendant Oluyemi Abiodun. I told her that I needed to be seen for my leg as well because I had just been assaulted and she told me to make a choice. She told me I could either be seen for the Panic/Asthma attack or my leg,

but not both. I chose my leg because I was barely able to walk.

92). After she examines my leg, she orders xrays to be taken of my right femur, prescribes me a cane, ~~and~~ increases my current pain medication, and addes narcotic medication.

93). After I was made to leave, this defendant creates a ~~medical record~~ falsified medical record in which she claims my blood pressure was low when actually it was extremely high. She also claimed in her physical exam assesment that my right thigh has a "deformity" likely consistent with prior rod placement, ignoring the fact that the area around my femur was tender, I just told her I was kicked by staff in my femur, and ignoring the fact that not one previous X-ray or medical record dating back to 2015, when I first had the IM Rod inserted, shows this deformity.

94). This defendant knowingly refused to secure or request for me to be taken to an emergency room in order to get a proper diagnosis and evaluation of the "deformity" despite me telling her I had just been kicked by staff in my femur and that this "deformity" was not pre-existing.

95). I returned to my housing Unit but was given no temporary cane or any type of assistant device to help me walk. Since I was prescribed narcotic medication, which is dispensed in medical, I ~~also~~ was made to ~~walk~~ walk back and forth to medical twice a day or ~~else~~ I wouldn't receive my dosage. As a result, I had to walk all the way to medical and back limping, humiliated, and in excruciating pain which caused me to cry on occassion and contemplate suicide.

96). On December 3, 2017, I was made to limp to medical to be seen again by Defendant Abisdun. I was supposedly being seen because due to "policy", I was being taken off ~~of~~ gabapentin and being put on elavil. During this visit, I stressed to this provider that I was being subjected to excruciating pain from having to limp around with no assistive ~~device~~ device. She then told me that I would have to wait until my cane was delivered because the cane she ordered was specially ordered in proportion to my exact height and weight in order to prevent further injury.

97). I then asked her was there any other substitute that I could use such as a

wheelchair but she refused saying that nothing was available.

98). She then proceeds to take my vital signs and blood pressure with a auto-matic blood pressure cuff. When she sees that my blood pressure is extremely high she states that this reading is impossible. She then repeats the test and gets the same results approximately. Defendant Abiodun then tells me to hold my injured leg in the air while she takes my blood pressure. When I refuse because that ~~████~~ compromising position would be extremely painful and inappropriate, Defendant Abiodun accuses me of knowing how to manipulate the blood pressure machine's ~~██~~ results.

99). She then takes my blood pressure manually in which the results, according to her, were still high but significantly lower than what the machine showed me. Even still, this defendant makes no effort to control my elevated blood pressure and still makes no request for emergency or specialty care and evaluation. ~~████~~

100). On December 5, 2017, I received several responses from the Residential Grievance Office. One response stated that the Transportation Van incident would be placed under investi-gation. The grievance I filed in reference to staff assaulting me on December 2, 2017 was dis-missed pending resubmission. I was to resubmit this grievance with additional information by December 12, 2017. My other grievances filed on December 1, 2017 were also dismissed but I was not provided the appeal forms to contest these responses.

101). On December 5, 2017, Radiologist Sudhir Kathuria found that ~~███~~ my right femur had a "residual deformity".

102). On December 7, 2017, I was taken in front of Defendant Hearing Officer Thomas Williams for the first false Trumped-up charge placed against me by defendant Iesha Butler but not the second false Trumped-up charge placed against me by defendant Atikibah.

103). On preliminary review, I brought up the fact that my right to be heard within 9 days excluding weekends and holidays was violated and that I was seeking a dismissal. Defendant Williams refused claiming the delay caused no harm.

104). I next brought up the fact that I never received an Inmate handbook that

specifies any of the rules of the institution and that this could be verified in ▓▓
▓ O.C.M.S. I then went on to inform him that he presided over the disciplinary hearing
▓▓ in which I got injured fighting the same man who, at that time, was ▓ facing
charges for my attempted murder. I also informed him that in that hearing he had exonerated
me after he had ▓verified my reasoning. I also told him that I believe these charges were
being used to retaliate against me.

105).   The Institutional Representative interrupted me stating, "That ain't nothing
to tell anyone, that you is a snitch". Defendant Thomas refused to check O.C.M.S stating,
"That ain't gonna work."

106).   I then moved on by asking Thomas Williams to summon the relevant camera
footage and grant me an opportunity to call witnesses in my defense. Defendant
Williams denied these requests also. I then stated, "I am being deprived of a fair hea-
ring. I never committed these actions and this is he say she say. I cant ask for no evidence.
I cant ask for a fair hearing."

107).   Defendant Williams then became angry and put me out the hearing, claiming that
I became belligerent and disrespectful because I stated the truth. I was never
belligerent nor disrespectful during my hearing.

108).   Defendant Williams then held my hearing absentia and found me guilty based on
defendant Iesha butler's report of the incident considering no other evidence. I was senten
ced to 100 days of segregation.

109).   While I was returning from the hearing, I saw a lieutenant walking down the
hall. When I attempted to get his attention, The Jane Doe Institutional Representative
knocked me onto the ground. Her and another officer who had no nametag then drag-
ged me onto the elevator. When we got to the floor I was housed on, I was thrown
off the elevator and my cane was thrown at me. I then remained sitting on the floor,
requesting to see a supervisor because I wished to press charges.

110).   When the major arrived, I informed her of the Institutional Representative's
actions and my desire to press charges and be seen by medical. I was allowed to go to

medical but, to my knowledge, no charges were ever filed on my behalf.

111). I immediately filed an administrative appeal with Defendant Randolph but I never received a response even though I spelled out all the violations so the Warden would know just what to look for. The defendant Warden ultimately affirmed the conviction claiming my appeal was never received.

112). Upon information and belief, The Correctional Staff at BCBIC had a long-standing pattern and practice of assaulting and retaliating against inmates they believed cooperated with The Baltimore City Police. These officials were engage in witness intimidation, staff assault, destruction of evidence, misconduct in office, and were using the disciplinary process to retaliate and punish the inmates who they assaulted.

113). Defendant Tyrell Wilson had been placed on notice of the abusive conduct of defendants Telp, Crawford, Hines, Allen, the John Doe officer whose name is believed to be butler, Solomon, as well as the emergency response Team/Tactical Unit as a whole and the fact that defendant Kevin Hickson was allowing his subordinates to use questionable force against detainees and inmates yet he failed to take disciplinary action against them or otherwise control their behavior

114). Defendant Dionne Randolph failed in her statutory duty to Supervise the Government, discipline, and policy of the Baltimore City Booking and Intake center, failed to direct the administering of punishment prescribed by the Commissioner of The Division of Pretrial Detention and services, and failed to enforce the regulations and directives of the Division of Pre-trial Detention and Services.

115). Defendant Dionne Randolph had knowledge that the conditions of the Baltimore City Booking and Intake Center were unsanitary, inhumane, and that BCBIC was generally out of control yet she failed to take effective remedial action to correct these long-standing Unconstitutional conditions of confinement. She had knowledge that BCBIC's staff and the members of the emergency response Team/Tactical Unit had a long-standing pattern and practice of assaulting and retaliating against inmates and detainees, especially the ones Suspected of cooperating with Baltimore City police; were generally engaged in misconduct,

destroying evidence, and using the disciplinary process as a means of punishment and retaliation yet she failed to take effective action to stop these Unconstitutional long-standing patterns and practices from continuing. She also knew the medical care system was inadequate yet failed to do anything to fix it.

116). Defendant Michael Resnick knew that the detainees committed to his custody were being held under inhumane, unsanitary, and unsafe conditions at the BCBIC. He also knew that BCBIC was generally out of control and that BCBIC's staff and the members of the emergency response team/tactical unit had a long-standing pattern and practice of of assaulting and retaliating against inmates and detainees, especially the ones suspected of cooperating with Baltimore City Police. He also knew his subordinates, Defendants Randolph and Wilson, were failing to Stop BCBIC's staff and the members of the emergency response team/tactical unit from engaging in this criminal and Unconstitutional conduct and that their failures were creating an unreasonable risk of harm to all pre-trial inmates and detainees yet he failed to make himself responsible for ending such a long-standing, widespread, and Unconstitutional pattern, practice, or custom.

117). Defendant Steven T. Moyer also knew that BCBIC was generally out of control and that BCBIC's staff and the members of the emergency response team/tactical unit had a long-standing history of assaulting and retaliating against inmates and detainees who cooperated with Baltimore City Police yet he failed to exercise his authority as the Head of The Department of Public Safety and Correctional Services to put an end to the criminal, long-standing, widespread, and unconstitutional pattern, practice, or custom as described above.

118). Defendant Baltimore City and its policy-making officials also had knowledge that the conditions of BCBIC were unsanitary, inhumane, and unsafe, and that the Jail was dangerously overcrowded. They also knew that the medical care system was inadequate yet they failed to take effective action to fix these Unconstitutional Conditions of Confinement. They also knew that BCBIC was generally out of control and that BCBIC's staff and the members of the emergency response team/tactical unit were targeting inmates

and detainees who had cooperated with Baltimore City Police and were assaulting them and retaliating against them by using the disciplinary process yet Baltimore City failed to do anything about it.

119). Also, on December 7, 2017, I was seen by Dr. Khalid El-Bedawi. I showed this provider my right leg and informed him that I was kicked in my femur by staff. Once he saw the condition of my leg he checked my vitals and found my blood pressure to be high. He diagnosed me with hypertension, continued my narcotic medication, and made a request for me to get orthopedic care in the form of evaluation and management. Presumably, this request was denied because I never received the care.

120). On December 8, 2017, I was transferred to M.R.D.C.C. and put on the Disciplinary Segregation Unit. On this same day, I resubmitted the grievance dealing with the staff assault that took place on December 2, 2017 but as time went on, I received no response.

121). On December 22, 2017, I was seen by defendant Mulugeta Akal. This defendant, after seeing the condition of my right leg, requested for me to get orthopedic care due to me being reinjured at the site of my previously fractured femur. My narcotic medication was not renewed and instead, only baclofen and elavil was prescribed for pain.

122). On January 5, 2018, I submitted a sick call request complaining that my legs were still hurting and that my current medication was not working. I noticed I wasn't being seen so I made another request on January 8, 2018 but was still not seen.

123). On January 12, 2018, I was seen by defendant Akal for a chronic care visit. I informed this defendant that my pain medications were not working yet he refused to make any adjustments to my medication to at least try to effectively manage my worsening and ongoing pain. It was at this visit that defendant Akal told me he would request for me to get physical therapy yet he never did. He also told me his request for orthopedic care for me was denied.

124). On February 23, 2018, I am again seen by defendant Akal for a chronic care visit. Despite my persistant complaints of uncontrolled pain, and his knowledge of my

previous injuries and reinjuries, he refuses to make any adjustments to my pain medication to at least try to effectively manage my chronic pain. He instead attempts to discredit and minimize my injury, and also threatens to take my cane away if I keep complaining about pain, physical therapy, and Orthopedic Care.

125). On March 23, 2018, the false-trumped-up charge placed against me was finally dropped down to a reprimand. The more serious charge of Engaging in a disruptive Act was dismissed.

126). On April 30, 2018, I was transferred to Maryland Correctional Institution-Hagerstown but not told why. I was placed on the Disciplinary Segregation Unit as a result of a prolonged Segregation Sentence unrelated to this complaint.

127). On May 2, 2018, I submitted a sick call request stating that my pain meds had expired. On May 4, 2018, I was seen by a sick call nurse and referred to a provider for further treatment.

128). On May 22, 2018, I was seen by Defendant Olawale for a chronic Care Visit. During this visit, I stressed to this provider that I was kicked by staff in my right femur and that I was experiencing ongoing pain in my right leg and that my current medication was not working to alleviate my pain. This defendant, despite my persistant complaints of inadequate pain coverage, ~~and despite my current~~ despite my documented evidence of a new injury to my previously fractured femur, and despite my history of bone and joint symptoms, refuses to make any adjustments to my medication to at least try to control and effectively manage my Chronic pain and makes no request for me to get Orthopedic or Specialty Care. He instead tells me to learn how to cope with being in pain.

129). On May 27, 2018, Correctional Officer Silva took my cane claiming that I needed paperwork from the providers at MCI-H in order to get it back. I was then forced to cuff in the back every time I came out my cell for showers. I was given the Cane back after I Saw a provider.

130). On June 17, 2018, I submitted another sick call request stating, "I'm in serious

pain in both legs and my back and these meds are not working."

131). On June 26,2018, I was seen by defendant Olawale again. The defendant increases my baclofen for 2 months only telling me I would have to find another way to deal with the pain I was experiencing because that was the last time he would increase my medication. He still refuses to refer me for Specialty or Orthopedic Care despite my documented injuries coupled with my worsening pain and bone and joint symptoms.

132). When my sentence expired in the beginning of July, I was told that per the Commissioner, I was to remain at MCI-H on Administrative Segregation as a pre-trial inmate. When I asked why, Case Manager Mason stated,"This must be for all "that trouble you caused down the road".Every month I was seen to review my placement on Administrative Segregation.Every month I was told there would be no change and that I would remain on Administrative Segregation until I either go home or receive a sentence.

133). On July 12,2018, I submitted a sick call request stating,"This blood pressure medicine is making me dizzy and giving me headaches. I am still in pain to the point that it is becoming harder for me to carry out my daily activities.

134). On July 14,2018, I was seen by a sick call nurse for my complaints of headaches, dizziness, and worsening back and leg pain.This nurse referred me to a provider for further evaluation and treatment.

135). On July 17, 2018, Custody Staff refused to take me to my chronic care Appointment for a reason unknown to me.

136). On August 14, 2018, I am finally seen by defendant Litell for management of my blood pressure medications.This defendant prescribes the same medication that I told her has been causing me adverse effects, and ignored my concerns.She also refuses to address my worsening pain when I bring the issue up, refuses to conduct an examination of my right leg, and refuses to refer me for Specialist or Orthopedic Care.

137). On August 28, 2018, I was seen again by a sick call nurse for complaints of

pain in both legs. I was then referred to a provider.

138). On September 7, 2018, I was seen by Defendant Lum Maximuangu for a chronic care visit. During this visit, I told the defendant that my current medication wa not controlling my worsening pain. I also informed her that I was kicked by staff in my fem and the pain is getting worse. This defendant notes that my knees had tenderness and that I exhibited pain with motion yet refuses to order any diagnostic tests whatsoever nor does she refer me for specialty or orthopedic care. She also refuses to make any adjustmen to my meds to at least try to control and effectively manage my worsening bone and joint pain nor does she attempt to control my hypertension.

139). On September 14, 2018, I submitted another sick call request because I was still in pain. However, I am never seen.

140). On September 21, 2018, I was taken to the emergency room of Meritus Medical Center for a p.r.e.a evaluation because I was sexually and physically assaulted by staff. Defendant Candice R. Crist ordered Xrays to be taken of my right femur to investigate my complaints of chronic pain in my right leg.

141). After examining the Xrays, the radiologist gave the following impression: "There is no acute fracture. Patient is status post fracture repair of the femur with prior gunshot or shrapnel. Extensive new bone formation is seen over the previous traumatic region. This may be related to sequela of chronic, healed Osteomyelitis. However, chronic recalcitrant or acute on chronic Osteomyelitis are possible. If there is concern for Osteomyelitis, consider 3 phase bone scan or tagged white blood cell scan. MRI would be less sensitive given the adjacent metallic structures and IMBA".

142). Upon Discharge, An after visit summary report was created that stated, among other things, follow-up care instructions stating, "There is evidence of large amount of bone growth over the femur area of the right leg, please see attached X-ray. Please follow-up with your doctor about this. Return to the Emergency department for further problems/concerns."

143). Instead of following the recommendation of its own Radiologist to conduct a 3 phase bone scan or tagged white blood cell scan in order to definitely diagnose the extensive new

bone formation/possible Osteomyelitis, found in my Xrays, I was ~~scheduled~~ scheduled an appointment to follow-up with Dr. Ben E. Oteyza, a surgery specialist. The appointment was supposed to take place sometime around September 22, 2018 or in one day. ~~too to~~

144). I was given a copy of the radiologist's impression of my X-rays as well as the after visit summary report and was discharged back to prison. The escort officers who had brought me to the emergency room were given this paperwork as well.

145). Following that admission, I was first seen for a post-offsite visit by defendant Kelly Bickford, upon returning to the prison. During this visit, I watched the escort officers, who transported me to and from the hospital, give the radiologist's impression of my Xrays conducted at Meritus as well as the after visit summary report to defendant Bickford.

146). I then told defendant Bickford that I was having leg pain and in response, she gave me my prescribed medications. I then asked her when would I be seen for the extensive new bone formation indicated in my Xrays and that I was concerned about what degree of Osteomyelitis I have. Defendant Bickford told me, "If you had Osteomyelitis, you would be dead."

147). After I was made to leave, defendant ~~Kelly~~ Bickford created a falsified record claiming I denied any pain or discomfort. She then only referred me to a provider for the sexual assault follow-up, but not for the extensive new bone formation/possible Osteomyelitis indicated in my Xray impression

148). On September 22, 2018 ~~Correctional~~ ~~officer~~ Correctional officer Silva takes my cane again and forces me to cuff in the back and limp all the way to medical for an unscheduled provider visit. Since the walk was nearly 10 minutes, by the time I got there I was in pain, exhausted, and ~~so~~ humiliated.

149). I was seen by Defendant Jamison who I asked to give me paperwork for my cane so that Staff would stop taking it. She refused claiming I had gotten to medical just fine without it, even though my blood pressure was elevated and I was in pain. She then said that cuffing modifications would need to be cleared through security. I then informed her that paperwork was requested for me to use my cane by the Lieutenant who accompanied me to the Emergency room just one day prior, however, she

still refuses.

150)   I then informed her that Xrays were performed while I was at Meritus Medical center to investigate my chronic pain and that extensive new bone formation was found over the femur area of my right leg where I had surgery in 2015 and where I was kicked by staff in December of 2017. I then went on explaining that because chronic recalcitrant or acute on chronic Osteomyelitis was possible, the radiologist recommended a 3 phase bone scan or tagged white blood cell scan to be performed to definitely diagnose my condition. ~~I also~~ I also ~~informed~~ informed her that I was supposed to follow-up with a Dr. Ben Oteyza.

151)   She then interrupted me saying, "you are only being seen for a p.r.e.a. follow-up because you claim you were raped". After conducting the p.r.e.a. follow-up, she tells Correctional officers Thrush and Silva, who were allowed to listen in on my medical visit, that she was done.

152)   On September 25, 2018, I am seen by defendant Maximuangu for a p.r.e.a follow-up again. I told this defendant also that I was experiencing pain in my right leg and that my medication was not working. I also informed her too that Xrays were performed while I was at Meritus and that extensive new bone formation was found over the femur area of my right leg where I had surgery in 2015 and where I was kicked by staff back in December of 2017. I then asked her to give me my cane back yet she refused claiming I was doing well without it, even though I told her I was not and I was limping and in pain. She then went on reviewing my medical records.

153)   I also informed her that the after visit summary report from Meritus stated that I was supposed to follow-up with a Dr. Ben Oteya. I also explained that because chronic recalcitrant or acute Osteomyelitis was possible, the radiologist from Meritus recommended a 3 phase bone scan or tagged white blood cell scan to be performed to definitely diagnose my condition. She then stated the appointment with Dr. Ben Oteyza had been cancelled but didnt tell me why. She then conducted the p.r.e.a follow-up only ignoring all my other concerns dealing with my right leg. After I was made to leave, she even falsifies documents making it seem as though I was okay, when in fact, I was complaining and in pain.

154)   On October 2, 2018, I am again seen by defendant Maximuangu for a p.r.e.a follow-up. I again complain of ongoing pain in my right leg and that my medication is not working. Yet

again, she still refuses ~~to me~~ to address this. She refuses to make any adjustments to my pain medication to at least try to effectively manage my ongoing and worsening pain and injury, refuses to physically examine my right leg, still refuses to refer me for specialty or Orthopedic Care, and still refuses address the recommendations made pursuant to the Xray impression of the radiologist from Meritus Medical Center concerning my right femur.

155). After this appointment, the documents relating to my treatment and the recommendations made while I was at Meritus Medical Center were faxed to Defendant Wexford Health Sources, Inc from Meritus Medical Center. However, ~~nothing~~ ~~no~~ ~~happens~~ no one does anything to ensure that I receive proper medical care.

156). On October 16, 2018, I am seen again by defendant Maximuangu for a p.r.e.a follow-up. I once again tell her my medication is not working and the pain is getting worse. Yet again, she refuses to make any adjustments to my pain meds to try to effectively manage my chronic and worsening pain and injury, refuses to physically examine my right leg, still refuses to refer me for specialty or Orthopedic care, and continues to ignore recommendations made at Meritus pursuant to the "Extensive new bone formation/possible Osteomyelitis indicated in the Xray impression given on September 21, 2018 concerning my right femur. She also continues her practice of ~~re~~ falsifying my medical records to make it seem as though I did not complain about anything and that I was fine, when in truth, she disregarded all my complaints and concerns.

157). On December 18, 2018, I am again seen by Defendant Maximuangu but this time for a 90 day follow-up chronic care Visit. I again inform her that my medication is not working ~~B~~ and the pain, and I believed the injury, were getting worse. I also informed her that it was becoming harder for me ~~to~~ pray and ~~to~~ exercise and that bending my knee is painful but when I un-bend it, my leg stings. In response, she makes minor adjustments to my pain medication and documents my bone and joint symptoms after recently denying they existed. However, she still refuses to physically examine my right leg, still refuses to refer me for specialty or Orthopedic care, and still continues to ignore the recommendations made at Meritus based on the "Extensive new bone formation/possible Osteomyelitis indicated in the Xray impression of the right femur Xray I had done there.

158). On March 11, 2019, Once again I am seen by defendant Maximuangu for a 90 day

follow-up chronic care visit. Once again I tell her that the medication is not working and that I believe the injury and the pain is getting worse because now standing is becoming more painful and when I exercise and pray. I also inform her that bending and unbending my knee is painful as well. She again makes minor adjustments to my pain medication but tells me to stop doing pushups and squats, which were in my daily routine, and only do cardiac exercise. She also claims the pain is relieved by rest yet I never told her that my pain was. Once again, she still refuses to physically examine my right femur, still refuses to refer me for specialty or Orthopedic Care, and still ignores the recommendations made at Meritus based on the Extensive new bone formation/possible Osteomyelitis indicated in the Xray impression of my right femur made by the radiologist from Meritus Medical center.

159). On April 17, 2019, I submit a sick call request because my condition is still getting worse. I state, "I am experiencing pain in my legs when I stand for long periods of time and also when I carry out my daily routines such as praying, exercise, stretching, walking, etc."

160). On April 20, 2019, I am seen by defendant Bickford for my complaints of leg pain. I told this defendant how my pain and injury was getting worse and is affecting my daily routines and that my medication was not working. Despite my complaints and her knowledge of my history of bone and joint symptoms and despite her knowledge of my meritus visit and the recommendations made there concerning my right femur, she refuses to refer me to a doctor.

161). On May 7, 2019, I am again seen by defendant Bickford but this time for swollen legs. Despite her observation of trace non-pitting edema. She still refuses to refer me to a provider.

162). On May 8, 2019, For reasons unknown to me, I was transferred from MCI-H to ECI. On May 25, 2019, I submitted a sick call request stating that my legs were swollen and that I was experiencing constant pain in both legs and my back.

163). On June 8, 2019, I was taken to "lock-up" for an unrelated matter and all my prescribed keep on person blood pressure medicine was confiscated and supposedly taken to medical by Correctional officers Tilghman and Paul.

164). From June 8, 2019 — June 18, 2019, none of the dispensary nurses would give me my prescribed blood pressure medicine even though I told them everyday I was experiencing pain

from excruciating headaches, blurred vision, and was at risk of a heat stroke or heart attack without it. There were no fans blowing air on the tier and no air circulating in my cell despite the extreme heat outside. This also caused me to have chest pains also.

165). Each day I would complain to the dispensary nurses that since arriving on Disciplinary Segregation, I have not received my high blood pressure medicine yet they refused to medicate me or do anything to help me.

166). On June 13, 2019, I was seen by defendant Sarah Johnson for my swollen legs. Because of the delay in being seen, the swelling had already decreased.

167). On June 18, 2019, I was seen by defendant Ruth Campbell for my 90-day follow-up chronic care visit. During this visit, I informed her that since being placed on Disciplinary Segregation I have not been getting my blood pressure medication and that I have been suffering from headaches, blurred vision, and chest pains. Once she saw that my blood pressure was elevated, she prescribed lisinopril and Norvasc to be given from stock.

168). When addressing my worsening pain issue, I informed defendant Campbell that I was experiencing pain in both legs that is aggravated when I stand for periods of time, when I walk, and during and after stretching, exercise, and my 5 daily prayers. I then informed her that my current meds were not ~~working~~ working to help me. I also informed her that I had xrays performed during my stay at Meritus medical center on September 21, 2018 and that extensive new bone formation was found over the femur area of my right leg ~~which~~ which is the site of previous fracture that was repaired in 2015 but was reinjured in 2017 when I was kicked by staff. I then said that ~~because~~ because chronic recalcitrant or Acute on chronic Osteomyelitis was possible, there were recommendations made for me to get a 3 phase bone scan or tagged white blood cell scan in order to definitely diagnose my condition and I was also supposed to follow up with a surgery specialist yet none ~~of~~ of these recommendations have been followed.

169). After she took a few minutes reviewing my records, she too refused to ~~refer~~ refer me for orthopedic or specialty care, refuses to physically examine my right femur, refuses to make adjustments to my pain medication to at least try to effectively manage my chronic and worsening pain and injury, and refuses to follow the recommendations made by meritus.

170). On July 3, 2019, I was seen by a sick call nurse for complaints of pain in my legs. I informed this nurse that I was still in pain and that my medication was not helping. I also informed her how I was being treated improperly because despite the X-ray result from 2018 saying I have either Chronic healed, Chronic recalcitrant, or Acute on chronic Osteomyelitis, not one doctor will help me. I then informed her how I couldn't workout or pray some days because of the pain associated with my worsening injury and that I needed proper treatment. This Nurse claims she saw no proof of my meritus visit in my Electronic Personal health records but nevertheless referred me to a provider for evaluation.

171). On July 5, 2019, I was seen by defendant Bruce Ford for right leg concerns. During this visit, I re-explained to him that I was still experiencing pain and my medication was not working. I went on by informing him that I had X-rays performed at meritus medical center on September 21, 2018 and that Extensive new bone formation was found over the femur area of my right leg which is the site of a previous fracture that was repaired in 2015 but was reinjured in 2017 when I was kicked by staff. I then said that because chronic recalcitrant or Acute on chronic Osteomyelitis could not be ruled out, there were recommendations made to conduct a 3 phase bone scan or tagged white blood cell scan in order to definitely diagnose my condition and that I was supposed to follow-up with a surgery specialist, yet none of these recommendations have been followed.

172). Without a Specialty in Orthopedics, and without following the recommendation of the radiologist from Meritus Medical center, this defendant then ruled out Chronic recalcitrant and acute on chronic Osteomyelitis yet he didn't even physically examine my right leg. He then orders new X-rays but refuses to refer me for Orthopedic or Specialty care. He also makes no adjustments to my meds to at least try to manage my chronic and worsening pain and injury.

173). On July 21, 2019, I file a complaint through the administrative remedy procedure stating, "I have been complaining of uncontrolled pain for months, stating that my meds are not working and not one doctor will help me. X-rays revealed I have a new injury and I am asking to be treated effectively."

174). On July 25, 2019, I am seen by defendant Sarah Johnson for complaints of sore leg pain making it painful to walk. My blood pressure was documented as high despite just taking my medication. I

was told I would see the provider that next day.

175). On July 26, 2019, I am again seen by defendant Ford who informed me he would have to re-order my repeat X-rays because they were never done. During this visit, I informed the defendant that I was still experiencing ongoing and worsening pain and so I asked him about neurontin or lyrica as an option because of my familiarity with taking these medicines and their effectiveness. In response, defendant Ford told me I had "unrealistic expectations of pain control" and instead, he prescribed cymbalta.

176). When discussing my plan of care for my elevated blood pressure, I told him that I was previously taking clonidine which was working. In response, he told me clonidine is very old medication and instead, he prescribed a trial period of atenolol. He also ordered my vital signs to be monitored for 10 days but this order was not followed. He again refuses to physically examine my right leg, still refuses to refer me for Orthopedic or Specialty Care, and still refuses to follow the recommendations made at Meritus concerning the extensive new bone formation/possible Osteomyelitis that was indicated in the September 21, 2018 X-ray impression of Meritus' radiologist.

177). On July 29, 2019, I was seen by defendant Sarah Johnson for pepper spray/use of force to the face. Despite me complaining about leg pain, defendant Johnson does not refer me to a provider.

178). On August 23, 2019, I am again seen by defendant Johnson. During this visit, I inform her that I am still suffering from tremendous pain in my legs and my medication is not working. This defendant observed that my temperature and blood pressure were high yet still refused to refer me to a provider.

179). On August 28, 2019, My re-ordered X-rays were read as having the following findings: "There is sequela of prior fracture s/p orif intact hardware. No new fractures. Bullet fragments in the soft tissues."

180). On August 29, 2019, defendant Walter West dismissed my A.R.P. I submitted on July 21, 2019 claiming that I was receiving adequate medical care for my condition yet the recommendations made at Meritus concerning my right femur were still not being followed and I was still suffering from uncontrolled pain and ineffective pain management.

181). On September 3, 2019, defendant Wayne Hill received my Appeal of defendant Walter West's

response to my A.R.P. request concerning the inadequate medical care of my right femur

182) On September 6, 2019, Defendant Hill dismisses my Headquarters appeal claiming that the Warden fully addressed my complaint which the Warden did not. Defendant Hill also claimed that documentation revealed that my medical concerns were being addressed by medical staff, however, medical staff were currently refusing to even refer me back to a provider despite my medication still not controlling my worsening bone and joint pain and despite my documented elevated blood pressure. The recommendations made at Mercitus concerning my right femur were also not being followed.

183) On September 7, 2019, once again I am seen by defendant Johnson for complaints that my pain and blood pressure medicine were not working. Defendant Johnson refuses to treat me or even examine me despite my complaints and refuses to refer me to a provider for immediate treatment

184) On September 11, 2019, I am seen by defendant Talmadge Reeves. This defendant tells me that somehow, the Cymbalta I was prescribed for pain was changed to say he prescribed it. This defendant stopped it because it was ineffective yet made no referral to the appropriate provider so that I could be prescribed something else.

185) On September 24, 2019, I was seen by defendant Marie Desir for multiple concussions to the left side of my face obtained from being struck in the head, face, and left shin repeatedly with a sock filled with wet paint while I was asleep. After treating me with ice, steri strips, and tylenol, Defendant desir allegedly called defendant Paul Matera who in turn ~~refused~~ refused to request or approve me to be sent to an emergency room even though I was at risk of having a concussion/brain trauma.

186) I was instead left in a cell reserved for suicide observation unmonitored, in excruciating pain and dizzy with intense headaches, and also covered in blood for about 5 hours. When defendant Sarah Johnson came around giving out morning medication, she saw my appearance and immediately went and told someone. I was then brought out my cell to see defendant ~~Raab~~ Raab.

187) I informed defendant Raab that I had been attacked in my sleep with a sock filled with wet paint and that I had an excruciating headache, that the light in the room was causing me to squint, that I was dizzy, and that the entire left side of my face hurt. ~~Raab~~ I also informed him

that my right leg was hurting and that in 2018, Xrays were taken of my right femur At Meritus Medical Center. I also told him that because the radiologist could not rule out chronic recalcitrant or Acute on Chronic Osteomyelitis, there were recommendations made to conduct a 3 phase bone scan or tagged white blood cell scan in order to definitely diagnose my condition. I then told him the recommendations were never followed and my injury is getting worse. He refused to follow the recommendation as well and refused to refer me for Specialty or Orthopedic care.

188).    Instead of defendant mab sending me to an emergency room, he ordered for me to be sent to the infirmary and given temporary medication. I was then taken back to the same cell and left there instead for another 5 hours, ~~while~~ suffering from tremendous pain, dizziness, and an excruciating headache.

189).   While I was in the infirmary, I explained to every provider I saw that my right leg was hurting and that in 2018, Xrays were taken of my right femur while I was at Meritus Medical center. I also informed them that because the radiologist could not rule out chronic recalcitrant or Acute on chronic Osteomyelitis, there were recommendations made to conduct a 3 phase bone scan or tagged white blood cell scan in order to definitely diagnose my condition. I also informed them that the recommendations were never followed and my injury is getting worse. They refused to follow the recommendations as well and refused to refer or secure specialty or Orthopedic care for me.

190).   On October 5, 2019, I submitted a sick call request stating, "I am constantly in pain in both legs and I have swelling. This blood pressure medicine is not controlling my high blood pressure and I am having dizzy spells and headaches. Current pain meds still not working".

191).   On October 16, 2019, I am seen by a ~~nurse~~ sick call nurse for my sick call submitted on October 5. Despite me being referred to a provider, I am not seen and was transferred to RCI on October 31, 2019.

192).   On November 11, 2019 I submit a sick call complaining that "my legs are hurting and I am having dizzy spells. My elavil has expired and I need it renewed. I also have not been getting my blood pressure medicine. There is a mark on my right leg that keeps scabbing and bleeding".

193).   On December 17, 2019, I am seen by defendant Monica Stallworth for a chronic care visit. During this visit, I started by informing the defendant that I have ~~been~~ not been getting my blood pressure medicine but when I was taking the lisinopril and norvasc, I was still experiencing headaches, blurred

fatigue

vision, and ~~concentration~~. In response, she ignores my complaints of adverse effects and prescribes the medicine anyway. I then tell her I was experiencing ongoing leg pain and that my current meds were not working. When she tells me she is going to prescribe 50 mg of elavil, I inform her that I was recently taking 125 mg of elavil and it wasn't working. She ignored me and prescribed this ~~one~~ also. I then went on to inform her that I had xrays performed at meritus medical center on September 21, 2018 and that extensive new bone formation was found over the femur area of my right leg where I ~~had~~ a I.M rod inserted in 2015 and where I was kicked by custody staff in 2017. I also informed her that because the radiologist could not rule out chronic recalcitrant or acute or chronic osteomyelitis, there were recommendations made to consider a 3 phase bone scan or tagged white blood cell scan that have still not been ordered. After viewing the after visit summary report, she too refuses to physically examine my right femur, refuses to refer me for specialty or orthopedic care, and refuses to follow the recommendations made at meritus concern ~~~~ing my right leg

194). Everyday afterward, from December 18, 2019 — January 7, 2020, I was denied the blood pressure meds and elavil that defendant Stallworth prescribed. After the first week of not receiving it, one of the Jane Doe Dispensary nurses informes me that defendant Correct Rx Pharmacy Services, Inc is refusing to send my prescription

195). On December 30, 2019, I am finally seen by defendant Litell who I told that I ~~have~~ had not been receiving my blood pressure meds nor the elavil prescribed on December 18, 2019, and that I have been suffering from headaches and uncontrolled pain in my right thigh, hip, and knee. She then finds out that my medication was sent to a correctional facility that I have never even been housed at before. She then tells me she would submit a early refill request form to get it sent to RcI yet she never does. I didnt get it until Kellie howard finally submitted the ~~~~ early refill request form on January 5, 2020.

# IV. CLAIMS FOR RELIEF

196). The plaintiff realleges and incorporates by reference paragraphs 1-195.

197). The actions of Iesha Butler in filing a false misbehavior report and recommending trumped-up charges against the plaintiff in order to punish him and retaliate against him for having filed a lawsuit against prison staff violated the plaintiff's rights under the first and fourteenth Amendment to the United States constitution and constituted gross negligence and/or the intentional infliction of emotional distress under state law

198). The actions of Norman Hawkins and Fatima Patterson in recommending and approving administrat
Segregation for known trumped-up and false disciplinary charges in order to punish and retaliate against
the plaintiff for having filed a lawsuit against prison staff violated the plaintiff's rights under the First and
fourteenth amendments to the United States Constitution and constituted gross negligence and/or the intentiona
infliction of emotional distress under state law.

199). The actions of Defendants Powell and Nufea in transporting the plaintiff in an unsafe vehicle, refusing
to strap him in a seatbelt, and then driving recklessly violated the plaintiff's rights under the fourteenth
Amendment to the United states constitution and constituted gross negligence and/or the intentional infliction of emoi
ional distress under state law and also violated the plaintiff's rights under the Americans with disabilities Act and the
rehabilitation Act.

200). The actions of Sergeant Bryant, as the supervisor of the defendants powell and nufea, allowing her subordinate
to continuosly transport detainees and inmates in an unsafe vehicle constituted deliberate indifference and/or
gross negligence, and contributed to and proximately caused the above-described violations of plaintiff's rights.

201). The actions of defendant Atihpoh in recommending trumped-up disciplinary charges be brought against the
plaintiff in order to punish, deter, and retaliate against him for exercising his right to seek redress from the prison through
use of the prison grievance system and/or to punish, deter, and retaliate against him for having filed a lawsuit against
prison staff violated the plaintiff's rights under the first and fourteenth Amendment to the United states constitution
and constituted gross negligence and/or the intentional infliction of emotional distress under state law.

202). The actions of defendant Thomas, in authorizing the plaintiff to be housed in a cell with known unsanitary
provisions and refusing to allow him to earn local credits all in an effort to punish, deter, and retaliate aga-
inst him for exercising his right to seek redress from the prison through use of the prison grievance system and/or to pun-
ish, deter, and retaliate against him for having filed a lawsuit against prison staff violated the plaintiff's rights
under the first and fourteenth Amendment to the United states constitution and constituted gross negligence and/or
the intentional infliction of emotional distress under state law.

203). The actions of defendant Hall in intentionally interfering with medical treatment once prescribed, failing to prevent
and/or intervene to stop the misuse of force occurring right in front of her, and then refusing to allow
the plaintiff to receive immediate medical attention for the injuries he received from the misuse of force violated
the plaintiff's rights under the first and fourteenth amendment to the United states constitution, violated the plaintiff's

rights under Americans with disabilities Act and the rehabilitation act, and constituted gross negligence and/or the intentional infliction of emotional distress under state law

204). The actions of defendant Jackson in intentionally interfering with prescribed medical treatment, summoning an emergency response team/tactical unit known to use excessive force and then refusing to intervene to stop the misuse of force as it happened right in front of her, refusing to then allow the plaintiff to receive needed immediate medical attention for the injuries he sustained from the misuse of force, and refusing to allow the plaintiff relief through the Chain of Command violated the plaintiff's rights under the First and fourteenth amendment to the United States constitution, denied him access to the Courts, violated the plaintiff's rights under the Americans with Disabilities Act and the rehabilitation Act, and constituted gross negligence and/or intentional infliction of emotional distress under state law.

205). The actions of defendants Telp, Crawford, Hines, Allen, Solomon, and a John doe correctional officer whose name is believed to be butler in using excessive force against the plaintiff and then refusing to allow him to receive needed medical attention for the injuries he sustained from the misuse of force violated the plaintiff's rights under the first and fourteenth amendment to the United States constitution, violated the plaintiff's rights under the Americans with Disabilities Act and the Rehabilitation Act, and constituted gross negligence and/or the intentional infliction of emotional distress under state law, and ASSault and battery

206). The actions of defendant Hickson in implementing or allowing to continue a pattern and practice of allowing and/or directing members of BCBIC's Emergency response team/tactical unit to assault inmates they believed cooperated with Baltimore City Police and then Conspiring to retaliate against those they assaulted constituted Criminal recklessness, deliberate indifference and/or gross negligence, and contributed to and proximately caused the above-described excessive use of force and assault and battery.

207). The actions of Thomas Williams in conducting the plaintiff's disciplinary hearing and the actions of defendant Randolph in sustaining it violated the plaintiff's rights under the first and fourteenth amendment to the United States constitution, violated the plaintiff's rights under the americans with disabilities Act and the rehabilitation Act, and constituted gross negligence and/or the intentional infliction of emotional distress under state law.

208). The failure of Defendant Wilson to take disciplinary or other action to curb the known pattern of physical abuse of inmates by defendants Telp, Crawford, Hines, Allen, Solomon, and Hickson constituted gross negligence and/or deliberate indifference and/or tacit Authorization, and contributed to and

proximately caused the above-described excessive use of force and assault and battery.

209). The failure of defendant Randolph to act on her knowledge that BCBIC's conditions of confinement were unsanitary, inhumane, and unsafe, that the jail was dangerously overcrowded and the medical care system was inadequate, and that BCBIC's staff and the members of its emergency response team/tactical unit had a long-standing pattern and practice of assaulting and using various retaliation tactics against inmates who had cooperated with Baltimore City Police constituted gross negligence and/or deliberate indifference and/or tacit authorization, and contributed to and proximately caused the above-described violations of the plaintiff's rights and the injuries sustained by the Plaintiff as well.

210). The failure of defendants Resnick and Moyer to take action to put an end to the long-standing, criminal, widespread, and unconstitutional pattern and practice of BCBIC's staff and the members of its emergency response team/tactical unit assaulting and using various retaliation tactics against inmates who had cooperated with Baltimore City Police constituted gross negligence and/or deliberate indifference and/or tacit authorization, and contributed to and proximately caused the above-described violations of the plaintiff's rights and the injuries sustained by the Plaintiff as well.

211). The failure of defendant Baltimore City and its policy-making officials to act on its knowledge that BCBIC's conditions of confinement were unsanitary, inhumane, and unsafe, that the jail was dangerously overcrowded and the medical care system was inadequate, and that BCBIC's staff and the members of its emergency response team/tactical unit had a long-standing pattern and practice of assaulting and using various retaliation tactics against inmates who had cooperated with Baltimore City Police constituted gross negligence and/or deliberate indifference and/or tacit authorization, and contributed to and proximately caused the above-described violations of the plaintiff's rights and the injuries sustained by the plaintiff as well.

212). Defendants Moyer, Resnick, and Randolph are also liable for the actions of their employees pursuant to the doctrine of Respondeat Superior under state law.

213). The actions of defendant Abiodun described in the Complaint violated the plaintiff's rights under the Fourteenth Amendment to the United States Constitution, violated the plaintiff's rights under the Americans with Disabilities Act and the Rehabilitation Act, and constituted malpractice and/or gross negligence and/or the intentional infliction of emotional distress under state law.

214). The failure of defendant Medical Director of BCBIC to ~~████████~~ ensure that plaintiff recei-

ved needed treatment, despite having knowledge of the plaintiff's serious medical needs, violated the plaint-iff's rights under the fourteenth Amendment to the United States constitution, violated the plaintiff's rights und-er the Americans with disabilities Act and the Rehabilitation act, and constituted negligence/malpractice and or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

215). The actions of defendant Jane Doe Institutional Representative of BCBIC violated the plaintiff's rig-hts under the first and fourteenth Amendment to the United States Constitution and also constituted gross negligence and/or assault and battery and/or intentional infliction of emotional distress under state law.

216) The actions of defendant Mulugeta Ahal described in the complaint violated the plaintiff's rights under the Eighth and fourteenth Amendment to the United States Constitution, violated the plaintiff's rights under the Americans with Disabilities Act and the Rehabilitation Act, and constituted negligence/malpractice and or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

217). The failure of defendant Medical director of MRDCC to ensure the plaintiff received needed treat-ment, despite having knowledge of the plaintiff's serious medical needs, violated the plaintiff's right under the eighth and fourteenth Amendment to the United States constitution, violated the plaintiff's rights under the Americans with disabilities Act and the Rehabilitation Act, and constituted negligence/malprac-tice and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

218). The actions of defendant Olawale described in the complaint violated the plaintiff's rights under the Eighth and fourteenth Amendment to the United States constitution, violated the plaintiff's rights under the Ame-ricans with disabilities Act and the rehabilitation act, and constituted negligence and/or gross negligence and or negligent or intentional infliction of emotional distress under state law.

219). The Defendant Wexford Health Sources, Inc. has/had a policy, practice, or custom of denying and/or delaying necessary medical treatment while it was the State's provider of health care. This Unconstituti-onal policy, practice, or custom, ~~which~~ which dictated the actions of many of the defendants while it was the state's provider of healthcare, contributed to and proximately caused the inadequate medical care claims described in this complaint up until December 31, 2018. Defendant Wexford Health Source-s, Inc is also liable for the actions of its employees pursuant to the doctrine of Respondeat Superior under state law and as such, the plaintiff is seeking indemnification from Wexford Health Sources, Inc for the actions of its employees while it was The State of Maryland's Provider of Health Care.

220). The actions of defendant Litell violated the plaintiff's rights under the eighth and fourteenth amendment to the United States Constitution, violated the plaintiff's rights under the americans with disabilities Act and the rehabilitation act, and constituted negligence and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law

221). The actions of defendants Bickford, Jamison, and maximwungu violated the plaintiff's rights under the eighth and fourteenth amendment to the United States Constitution, violated the plaintiff's rights under the Americans with disabilities Act and the rehabilitation Act, and also constituted negligence and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law

222). The refusal of defendant Crist to ~~████████████~~ Order or authorize the recommended medical scans in order to definitely diagnose the plaintiff's condition of his right femur violated the plaintiff's rights under the fourteenth Amendment to the United States Constitution, violated the plaintiffs rights under the Americans with disabilities Act and the rehabilitation Act, and also constituted negligence/malpractice and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

223). The failure of defendant Erwin Aldana and The deputy Corporate medical director to ensure the plaintiff received needed treatment, despite having knowledge of the plaintiffs serious medical needs, violated the plaintiff's rights under the Eighth and fourteenth Amendment to the United States Constitution, violated the plaintiffs rights under the Americans with disabilities Act and the rehabilitation Act, and constituted negligence/malpractice and/or gross negligence and/or negligent or intentional infliction of emotional distress

224). The actions of defendant Baucom in adopting a Utilization review system for specialist consultation and surgery approval that operates to limit care as much as possible and her failure to correct the failures of the medical tracking system and to correct the failure of medical holds and coordination of patient work up between prisons constituted deliberate indifference and/or gross negligence, and contributed to and proximately caused the plaintiff to be denied needed medical care for his serious medical needs and suffer serious physical and emotional injuries and deprivation of his rights

225). The actions of the members of the Utilization Management Review panel in denying necessary ~~████ ████~~ Specialty or Orthopedic Care violated the plaintiff's rights under the eighth and fourteenth amendment to the United States Constitution, violated the plaintiff's rights under the americans with disabilities Act and the rehabilitation Act, and constituted negligence/malpractice and/or gross negligence and/or negligent

or intentional emotional distress under state law.

226). The actions of defendant Assistant Warden of MCI-H in failing to ensure the plaintiff was transported to his needed recommended medical appointment constituted gross negligence and/or deliberate indifference and/or tacit Authorization, and contributed to and proximately caused the plaintiff to suffer deprivations of his rights and suffer physical and emotional injuries.

227). The actions of the Jane Doe dispensary nurses, Marie desir, and Sarah Johnson violated the plaintiff's rights under the first, eighth, and fourteenth amendment to the United States Constitution, violated the plaintiff's rights under the americans with disabilities Act and the rehabilitation Act, and constituted negligence and/or gross negligence and/or the negligent or intentional infliction of emotional distress.

228). The actions of Ruth Cambell and Bruce ford violated the plaintiff's rights under the eighth and fourteenth amendment to the united States Constitution, violated the plaintiff's rights under the Americans with disabilities act and the rehabilitation Act and constituted negligence and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

229) The actions of defendants Matera, Raab, and Tabulov violated the plaintiff's rights under the eighth and fourteenth Amendment to the United States Constitution, violated the plaintiff's rights under the Americans with disabilities Act and the rehabilitation Act, and constituted negligence/malpractice and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

230). The failure of defendant Clem to ensure the plaintiff received needed treatment, despite having knowledge of the plaintiff's serious medical needs, violated the plaintiff's rights under the Eighth and fourteenth amendment to the United States Constitution, violated the plaintiff's rights under the Americans with disabilities Act and the rehabilitation Act, and constituted negligence/malpractice and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

231). The refusal of defendants West, Campbell, and Hill to remedy the plaintiff's complaints of inadequate medical care despite gaining knowledge through the Administrative Remedy Procedure violated the plaintiff's rights under the Eighth and fourteenth amendment to the United States Constitution, violated the plaintiff's rights under the americans with disabilities Act and the rehabilitation act, and constituted gross negligence and/or negligent or intentional infliction of emotional distress under state law.

232) The actions of defendants Stallworth and Choudry violated the plaintiff's rights under the eighth and four-

teenth Amendment to the United States Constitution, violated the plaintiff's rights under the Americans with disabilities Act and the rehabilitation act, and constituted negligence/malpractice and/or gross negligence and/or negligent or intentional infliction of emotional distress under state laws.

233) The actions of defendants Jane doe dispensary nurses of RCI and The Correct Rx Pharmacy Services, I, violated the plaintiff's rights under the eighth and fourteenth amendment to the United States Constitution violated the plaintiff's rights under the Americans with disabilities Act and rehabilitation act, and constitute negligence and/or gross negligence and/or negligent or intentional infliction of emotional distress under state law.

234) The Defendant Corizon Health has a policy, practice, or custom of denying and/or delaying necessary medical treatment as the State's current health care provider. This unconstitutional policy, practice, or custom, ~~which~~ which dictated and currently dictates the actions of many of the defendants, violated and continues to violate the plaintiff's rights under the eighth and fourteenth Amendment to the United State Constitution and the plaintiff's rights under the Americans with disabilities Act and the rehabilitation Act. Defendant Corizon Health is also liable for the actions of its employees pursuant to the doctrine of Respondeat Superior under state law and as such, the plaintiff is seeking indemnification from Corizon Health for the actions of its Employees.

## VI. RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully requests this Honorable Court TO enter Judgment:

(A). GRANTING the plaintiff a declaration that states that the acts and omissions described herein violated his rights under the Constitution and laws of the United States and/or the laws of The State of Maryland.

(B) ISSUE a Preliminary and Permanent In Junction Ordering defendants or their agents to immediately arrange for the plaintiff to be examined by a qualified orthopedic specialist and to obtain from that ~~qualified~~ specialist an evaluation of the condition of the Plaintiff's right leg and a course of treatment that will restore and maintain the full function of his right leg, and carry out without delay the treatment recommended pursuant to that care.

C). ISSUE an Injunction expunging the disciplinary conviction described in this complaint from the Plaintiff's Institutional record

D). Award Compensatory damages, Jointly and severally, against each defendant for plaintiff's physical and emotional injuries.

E) Award Punitive damages against each eligible defendant

F). Plaintiff seeks a Jury Trial on all issues triable by Jury

G). Plaintiff also seeks recovery of costs in this Suit, and any other relief this court deems Just, proper, and equitable.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct either by my personal knowledge or on information and belief.

SIGNED This 9th day of December, 2020

*Nafiz Watkins*

Signature of Plaintiff

Nafiz Shawn Watkins

Printed full name of Plaintiff

18701 Roxbury Road Hagerstown, Maryland 21746

Address of Plaintiff