**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NAFIZ WATKINS,

    Plaintiff,

    v.

OIUYEMI ABIODUN, *et al.*,

    Defendants.

Civil Action No.:  JRR-20-208

**MEMORANDUM OPINION**

Pending before the court is the Motion to Dismiss or for Summary Judgment filed by Defendants Oluyemi Abiodun, M.D., Mulugeta Akal, M.D., Kelly Bickford, R.N., Crystal Jamison, P.A., Munjanja Litell, NP, Lum Maximuangu, NP, and Olufemi Olawale, NP.  ECF No. 136 (hereafter the "Motion").  Defendants seek dismissal or summary judgment in their favor on the claims asserted against them in Plaintiff Nafiz Watkins's third amended verified complaint (ECF No. 84-1).  Mr. Watkins opposes the motion, asserting that he requires discovery to properly oppose the motion.  ECF No. 146.  Upon review of the record, a hearing is not necessary. Local Rule 105.6 (D. Md. 2021).  For the reasons stated below, Defendants' Motion, construed as one seeking summary judgment, shall be granted.

**BACKGROUND**

Mr. Watkins is self-represented and is currently incarcerated in the Central Maryland Correctional Facility in Sykesville, Maryland.  He alleges that on December 2, 2017, when he was incarcerated at the Baltimore Central Booking and Intake Center ("BCBIC"), he was kicked in his right thigh by one or more correctional officers who were forcing him back into his cell.  ECF No.

84-1 at 10, 12, ¶¶ 76, 89.  Mr. Watkins later had a panic attack and/or an asthma[1] attack on the same day of the assault which required his transport to the medical unit by wheelchair.  *Id*. at 12-13, ¶¶ 90-91.

Mr. Watkins claims that once he reached medical, he was seen by defendant Dr. Oluyemi Abiodun, who told him he would have to choose if he wanted to be treated for his breathing difficulty or for the injury to his leg.  ECF No. 84-1 at 12-13, ¶ 91.  Mr. Watkins states that he chose being treated for his leg injury because he was barely able to walk due to the pain.  *Id*.  Dr. Abiodun noted that Mr. Watkins's right thigh had a deformity consistent with prior rod placement but did not note that Mr. Watkins's thigh was tender.  *Id*. at 13, ¶ 93.  Mr. Watkins told Dr. Abiodun that there had never been an x-ray showing a deformity in his leg since his 2015 surgery when a rod was inserted into his leg after a gunshot wound.  *Id*.  Dr. Abiodun increased Mr. Watkins's pain medication dosage, added a narcotic pain medication, prescribed a cane, and ordered x-rays of his right femur but required Mr. Watkins to return to his housing unit without providing him a temporary cane.  *Id*. at ¶ 95.  According to Mr. Watkins, however, Dr. Abiodun should have sent him to an emergency room to get a diagnosis for the deformity in his leg because Mr. Watkins told her that he had just been kicked in that leg and the deformity was not pre-existing.  *Id*. at ¶ 94.  Mr. Watkins explains that because he was prescribed narcotic pain medication, which is only dispensed in the medical unit, he was required to walk to and from his housing unit "in excruciating pain which caused [him] to cry on occasion and contemplate suicide."  *Id*. at ¶ 95.

On December 3, 2017, Dr. Abiodun told Mr. Watkins that his pain medication was being changed from gabapentin to Elavil "due to policy."  ECF No. 84-1 at 13, ¶ 96.  When Mr. Watkins complained he had not yet received the cane that was prescribed and was forced to walk with

---

[1]      According to Mr. Watkins, the conditions of his cell at BCBIC necessitated his regular use of a nebulizer. ECF No. 84-1 at 10-11.

excruciating pain, Dr. Abiodun explained that the cane had to be ordered so that it was specific to Mr. Watkins's height and weight. *Id*. When Mr. Watkins asked if there was a wheelchair he could use in the interim, Dr. Abiodun said there was nothing available. *Id*. at 13-14, ¶ 97. During this visit, Dr. Abiodun took Mr. Watkins's blood pressure with an "automatic blood pressure cuff." *Id*. at 14, ¶ 98. Mr. Watkins recalls that Dr. Abiodun remarked that the extremely high blood pressure reading was "impossible." *Id*. Dr. Abiodun took Mr. Watkins's blood pressure again and the reading remained high. *Id*. Mr. Watkins claims that Dr. Abiodun asked him to hold his injured leg in the air while she took his blood pressure which Mr. Watkins refused to do because it would have been too painful. *Id*. Mr. Watkins states that Dr. Abiodun accused him of "knowing how to manipulate the blood pressure machine results." *Id*. Finally, Dr. Abiodun took Mr. Watkins's blood pressure manually which rendered results that were high but significantly lower than the two prior readings. *Id*. at ¶ 99. Dr. Abiodun did not make a request for emergency or specialty care despite the high blood pressure readings. *Id*.

On December 5, 2017, the radiologist read Mr. Watkins's x-ray and noted that there was a residual deformity of the right femur in relation to the prior rod placement. ECF No. 84-1 at 14, ¶ 101.

On December 7, 2017, Mr. Watkins was seen by Dr. Khalid El-Bedawi, who examined the leg injury. ECF No. 84-1 at 18, ¶ 119. Dr. Bedawi checked Mr. Watkins's vitals and discovered that he was hypertensive. *Id*. The narcotic pain medication was continued and Dr. Bedawi put in a request for Mr. Watkins to "get orthopedic care in the form of evaluation and management." *Id*. According to Mr. Watkins, he never received this care. *Id*.

On December 8, 2017, Mr. Watkins was transferred to Maryland Reception Diagnostic and Classification Center ("MRDCC"). ECF No. 84-1 at 18, ¶ 120. On December 22, 2017, Mr.

Watkins was seen by Dr. Mulugeta Akal, who, after seeing the condition of Mr. Watkins's leg, made a request for Mr. Watkins to receive "orthopedic care." *Id*. at ¶ 121. Mr. Watkins states that Dr. Akal was concerned about his leg because it had been "reinjured at the site of [his] previously fractured femur." *Id*. At this time, Mr. Watkins's prescription for narcotic medication was not renewed and he was prescribed Baclofen and Elavil for his pain. *Id*.

On January 5, 2018, Mr. Watkins submitted a sick call slip indicating that his leg still hurt and that the current medication he was receiving was not relieving the pain. ECF No. 84-1 at 18, ¶ 122. After receiving no response, Mr. Watkins sent in a second sick call slip concerning the same matter on January 8, 2018, but states he was still not seen. *Id*.

On January 12, 2018, Mr. Watkins was seen by Dr. Akal for a chronic care visit. ECF No. 84-1 at 18, ¶ 123. Although Mr. Watkins told Dr. Akal that the pain medication he was receiving was not working, Dr. Akal made no changes to the medication prescribed. *Id*. Dr. Akal informed Mr. Watkins that the request for orthopedic care had been denied but that he would put in a request for Mr. Watkins to receive physical therapy. *Id*. According to Mr. Watkins, the promised request for physical therapy was never fulfilled. *Id*.

On February 23, 2018, Mr. Watkins was again seen by Dr. Akal for a chronic care visit. ECF No. 84-1 at 18, ¶ 124. Despite Mr. Watkins's continued complaints that his current medication was not adequately controlling the pain in his leg, Dr. Akal refused to make any adjustments to the prescribed medication "to at least try to effectively manage [Mr. Watkins's] chronic pain." *Id*. at 19, ¶ 124. Mr. Watkins recalls that Dr. Akal instead attempted to "discredit and minimize" his injury and then threatened to take the cane away if Mr. Watkins continued to complain about the pain, physical therapy, and orthopedic care. *Id*.

Mr. Watkins was transferred to Maryland Correctional Institution Hagerstown ("MCIH") on April 30, 2018.  ECF No. 84-1 at 19, ¶ 126.  On May 2, 2018, Mr. Watkins submitted a sick call slip because his pain medications had expired.  *Id*. at ¶ 127.  Two days later, Mr. Watkins was seen by a nurse, who referred him to a provider.  *Id*.

On May 22, 2018, Mr. Watkins was seen by Olufemi Olawale, NP, for a chronic care visit. ECF No. 84-1 at 19, ¶ 128.  After Mr. Watkins explained to Olawale that: he was experiencing ongoing pain in his right leg with no relief from his currently prescribed medication; he had a new injury to a previously fractured femur; and he had a history of bone and joint symptoms, Olawale refused to change Mr. Watkins's medication.  *Id*.  Instead, Olawale advised Mr. Watkins to learn to cope with the pain.  *Id*.  Olawale also did not make any referrals for Mr. Watkins to receive orthopedic care or specialty care.  *Id*.

On June 17, 2018, Mr. Watkins submitted a sick call slip indicating he was "in serious pain in both legs and [his] back" and that the medication he was receiving was not working.  ECF No. 84-1 at 19-20, ¶ 130.  On June 26, 2018, Mr. Watkins was seen by Olawale again.  *Id*. at 20, ¶ 131. Olawale increased the dosage of Baclofen for two months but advised Mr. Watkins he would need to find another way to deal with the pain because he would not increase the medication again.  *Id*. Olawale again refused to refer Mr. Watkins to be seen by a specialist.  *Id*.

On July 12, 2018, Mr. Watkins submitted a sick call slip complaining that the blood pressure medication was making him dizzy and giving him headaches.  ECF No. 84-1 at 20, ¶ 134. Two days later he was seen by a sick call nurse who referred him to a provider.  *Id*.  Mr. Watkins claims that custody staff refused to take him to a chronic care appointment on July 17, 2018, he therefore was not seen until August 14, 2018, for the issue concerning his blood pressure medication.  *Id*. at ¶¶ 135-36.

On August 14, 2018, Mr. Watkins was seen by Munjanja Litell, NP, to address his complaint about his blood pressure medication.  ECF No. 84-1 at 20, ¶ 136.  According to Mr. Watkins, Litell prescribed the same medication that caused the side effects he complained about and otherwise ignored his concerns.  *Id*.  Litell also refused to address the worsening pain in Mr. Watkins's right leg and refused to examine his leg.  *Id*.

On August 28, 2018, Mr. Watkins was again seen by a sick call nurse for his complaints of pain in both legs.  ECF No. 84-1 at 20-21, ¶ 137.  Mr. Watkins was referred to a provider.  *Id*.

On September 7, 2018, Mr. Watkins was seen by Dr. Lum Maximangu for a chronic care visit.  ECF No. 84-1 at 21, ¶ 138.  Mr. Watkins told Dr. Maximangu about the injury to his right leg when he was kicked by correctional officers and reported that the pain was worsening.  *Id*.  Dr. Maximangu noted that Mr. Watkins had tenderness in his knees and that he exhibited pain with motion but did not order any diagnostic tests or refer him for orthopedic or specialty care.  *Id*.  Additionally, Mr. Watkins states that Dr. Maximangu refused to make any adjustments to his pain medication, nor did she address his hypertension.  *Id*.

Mr. Watkins's September 14, 2018 sick call complaining about pain went unaddressed.  ECF No. 84-1 at 21, ¶ 139.

On September 21, 2018, Mr. Watkins was taken to the emergency room at Meritus Medical Center for evaluation after he reported he had been sexually and physically assaulted by staff.  ECF No. 84-1 at 21, ¶ 140.  Candice R. Crist ordered x-rays of Mr. Watkins's right femur to investigate his complaints of chronic pain.  *Id*.  The radiologist that read the x-ray observed that:

> There is no acute fracture.  Patient is status post fracture repair of femur with prior gunshot or shrapnel.  Extensive new bone formation is seen over the previous traumatic region.  This may be related to sequela of chronic, healed

> Osteomyelitis.[2]  However, chronic recalcitrant or acute chronic Osteomyelitis are possible.  If there is concern for Osteomyelitis, consider 3 phase bone scan or tagged white blood cell scan.  MRI would be less sensitive given the adjacent metallic structures and IM rod.

ECF No. 84-1 at 21, ¶ 141.  Follow-up instructions provided to Mr. Watkins by Meritus Medical Center indicated that "[t]here is evidence of large amount of bone growth over the femur area of the right leg . . . .  Please follow up with your doctor about this."  *Id*. at ¶ 142.  Mr. Watkins states that despite the radiologist's report and recommendation, the suggested tests were not performed.  *Id*. at 21-22, ¶ 143.  Instead, Mr. Watkins was scheduled for an appointment with Dr. Ben E. Oteyza, a surgeon.  *Id*. at 22, ¶ 143.  The appointment was to occur on September 22, 2018.  *Id*.

When Mr. Watkins was discharged from Meritus Medical Center, he was given a copy of the radiologist report and the after-visit summary report.  ECF No. 84-1 at 22, ¶ 144.  Once he was back at the prison, Mr. Watkins was seen by Kelly Bickford, RN.  *Id*. at ¶ 145.  The correctional officers who escorted Mr. Watkins to and from the hospital gave Bickford the radiologist report as well as the after-visit summary.  *Id*.  Mr. Watkins told Bickford his leg was painful, and she provided him with his prescribed medication.  *Id*. at ¶ 146.  When Mr. Watkins expressed concern about having Osteomyelitis, Bickford told Mr. Watkins that if he had it, he would be dead.  *Id*.  Mr. Watkins was "made to leave" and claims Bickford falsified a record by stating that Mr. Watkins denied any pain or discomfort.  *Id*. at ¶ 147.  Bickford referred Mr. Watkins to a provider to follow-up on the sexual assault allegation but no referral was made to a provider for the condition of his leg.  *Id*.

On September 22, 2018, Officer Silva confiscated Mr. Watkins's cane, forced him to be handcuffed in the back, and to "limp all the way to medical for an unscheduled provider visit."

---

[2]      "Osteomyelitis is inflammation or swelling that occurs in the bone.  It can result from an infection somewhere else in the body that has spread to the bone, or it can start in the bone – often as a result of an injury." https://www.hopkinsmedicine.org/health/conditions-and-diseases/osteomyelitis (last visited June 1, 2022).

ECF No. 84-1 at ¶ 148.  Mr. Watkins recalls that it took him almost 10 minutes to walk to the medical unit and when he arrived, he was "in pain, exhausted, and humiliated."  *Id*.  Mr. Watkins was seen by Crystal Jamison, PA.  *Id*. at ¶ 149.  Mr. Watkins asked Jamison if she could give him paperwork for his cane so that security would stop taking it from him, but she refused because in her view, he "had gotten to medical just fine without it."  *Id*.  Mr. Watkins states that his blood pressure was elevated and he was in pain.  *Id*.  Although Mr. Watkins told Jamison that the paperwork for his cane was requested by the lieutenant who accompanied him to the emergency room the day before, Jamison still refused to provide any paperwork approving Mr. Watkins's use of a cane.  *Id*.

Mr. Watkins explained to Jamison that he had an x-ray done of his right leg, relayed the information contained in the radiologist's report, and told her he was supposed to have a follow-up visit with Dr. Ben Oteyza.  ECF No. 84-1 at 23, ¶ 150.  Jamison interrupted Mr. Watkins and told him that he was only being seen for a Prison Rape Elimination Act ("PREA") follow-up "because you claim you were raped."  *Id*. at ¶ 151.  Jamison conducted the appointment with Mr. Watkins while Officers Thrush and Silva remained in the room.  *Id*.  Mr. Watkins was then escorted out of medical.  *Id*.

On September 25, 2018, Mr. Watkins was again seen for a PREA follow-up; this time he was seen by Dr. Maximangu.  ECF No. 84-1 at 23, ¶ 152.  During this visit, Mr. Watkins told Dr. Maximangu about the pain in his right leg, the x-ray report from Meritus Medical, and the injury to his right leg when he was kicked by staff in December of 2017.  *Id*.  When asked if she would give Mr. Watkins his cane back, Dr. Maximangu refused because he "was doing well without it." *Id*.  Mr. Watkins told her that he was not doing well and that he was limping due to the pain, but Dr. Maximangu again refused his request.  *Id*.  Mr. Watkins also told Dr. Maximangu that the

after-visit summary report from Meritus indicated he was supposed to follow-up with Dr. Ben Oteyza. *Id*. at ¶ 153. Dr. Maximangu told Mr. Watkins that his appointment with Dr. Oteyza had been cancelled but did not tell him why. *Id*. Following this visit, Mr. Watkins claims that Dr. Maximangu created a false record making it seem that Mr. Watkins had no complaints. *Id*.

On October 2, 2018, Mr. Watkins was again seen by Dr. Maximangu for a PREA follow-up. ECF No. 84-1 at 23, ¶ 154. Mr. Watkins complained about his ongoing right leg pain, and explained that his medication was not working, but Dr. Maximangu refused to make any adjustments to Mr. Watkins's pain medication. *Id*. at 24, ¶ 154. Dr. Maximangu also refused to refer Mr. Watkins for specialty or orthopedic care, and refused to address the recommendations made by the radiologist at Meritus Medical. *Id*. According to Mr. Watkins, the documents regarding his x-ray at Meritus Medical were faxed to Wexford Health Sources, Inc. after this visit, but "no one [did] anything to ensure [he] receive[d] the proper medical care." *Id*. at ¶ 155.

On October 16, 2018, Mr. Watkins was once again seen by Dr. Maximangu for a PREA follow-up. ECF No. 84-1 at 24, ¶ 156. Mr. Watkins again complained about his medication not working and worsening pain, but Dr. Maximangu refused to adjust his pain medication, to conduct an exam of his leg, or refer him to a specialist. *Id*. Dr. Maximangu also created a record indicating that Mr. Watkins did not complain about anything during this visit. *Id*.

Mr. Watkins saw Dr. Maximangu again on December 18, 2018, and March 11, 2019, for chronic care visits. ECF No. 84-1 at 24-25, ¶¶ 157, 158. At both appointments Mr. Watkins complained of worsening pain in his legs and told her that bending and straightening his knee was painful and, on each occasion, Dr. Maximangu made minor adjustments to Mr. Watkins's medication. *Id.* During the March visit, Mr. Watkins explained that the pain was now present when he was standing and became more painful when he exercised or prayed. *Id*. at 25, ¶ 158.

9

Dr. Maximangu advised Mr. Watkins to stop doing push-ups and squats, which were a part of his daily routine, and instead to only do cardio exercise.  *Id*.  At neither appointment did Dr. Maximangu conduct a physical exam of Mr. Watkins's leg or knees and she refused to refer him to a specialist or order the tests recommended by the radiologist.  *Id*.

On April 17, 2019, Mr. Watkins reported in a sick call slip that his condition was worsening with pain in his legs when he stood for long periods of time and when he carried out his daily routines such as praying, exercise, stretching and walking.  ECF No. 84-1 at 25, ¶ 159.  Mr. Watkins was seen for this complaint on April 20, 2019, by Kelly Bickford, who refused to refer Mr. Watkins to a doctor despite her knowledge of his history with bone and joint symptoms and the recommendations made by the Meritus Medical Center radiologist.  *Id*. at ¶ 160.  Bickford saw Mr. Watkins again on May 7, 2019, for his complaint of swelling in his legs, but she again refused to refer him to a doctor.  *Id*. at ¶ 161.  The following day Mr. Watkins was transferred to Eastern Correctional Institution ("ECI").  *Id*. at ¶ 162.

From June 8, 2019, when Mr. Watkins's "keep on person" medication was confiscated, through June 18, 2019, the dispensary nurses at ECI would not give Mr. Watkins his prescribed blood pressure medicine despite his reports of "excruciating headaches and blurred vision.  ECF No. 84-1 at 25-26, ¶¶ 163-64.  At the time, Mr. Watkins was housed on disciplinary segregation and complained daily that he did not receive his blood pressure medication.  *Id.* at 26, ¶ 165.  Despite his repeated complaints, nobody did anything to help Mr. Watkins.  *Id*.

On June 18, 2019, Mr. Watkins was seen by Ruth Campbell for a chronic care visit.  ECF No. 84-1 at 26, ¶ 167.  Mr. Watkins informed Campbell that he had not received his blood pressure medication since being assigned to disciplinary segregation and complained of headaches, blurred vision, and chest pains.  *Id*.  Campbell took Mr. Watkins's blood pressure, saw that it was elevated,

and prescribed lisinopril and Norvasc "to be given from stock." *Id*. When addressing the issue of his worsening pain, Mr. Watkins explained the history of the injury to his right leg, the x-ray results, the recommendations made by the radiologist, and that the pain increased when he was walking or performing normal daily activities. *Id*. at ¶ 168. Campbell also refused to refer Mr. Watkins to a specialist and refused to adjust his pain medication. *Id*. at ¶ 169.

In July of 2019, Mr. Watkins was seen on four occasions. ECF No. 84-1 at 27-28. During a visit on July 3, 2019, Mr. Watkins claims a sick call nurse told him there was no evidence of his treatment at Meritus Medical Center in his medical record. *Id*. at 27, ¶ 170. The nurse referred Mr. Watkins to a provider for an evaluation of his complaint that his legs hurt and the medication was not relieving his pain. *Id*. When Mr. Watkins was seen by Bruce Ford two days later, he again explained the history of his right leg injury and the worsening pain as well as the content of the radiologist's report on his x-ray. *Id*. at ¶ 171. According to Mr. Watkins, Ford ruled out the possibility of chronic recalcitrant and acute chronic Osteomyelitis without performing a physical exam, but Ford did order a new x-ray. *Id*. at ¶ 172.

On July 25, 2019, Mr. Watkins was seen by Sarah Johnson regarding his complaints of leg pain that worsened while walking. ECF No. 84-1 at 27, ¶ 174. Despite the fact that Mr. Watkins had taken his blood pressure medication shortly before the visit, Mr. Watkins's blood pressure remained high. *Id*. The following day Mr. Watkins was again seen by Ford, who told him the repeat x-rays would need to be reordered because they were never done. *Id*. at 28, ¶ 175. Mr. Watkins asked about being prescribed Neurontin or Lyrica to manage his pain, and Ford remarked that Mr. Watkins had an unrealistic expectation of pain control. *Id*. Ford prescribed Cymbalta for Mr. Watkins. *Id*. With regard to Mr. Watkins's blood pressure, Ford prescribed a trial period of

atenolol, and ordered his vital signs to be monitored for ten days, but the latter order was not carried out. *Id*. at ¶ 176.  No referral to a specialist was issued during this appointment. *Id*.

Mr. Watkins saw Sarah Johnson again on July 29, 2019, for a "pepper spray/use of force" incident.  ECF No. 84-1 at 28, ¶ 177.  Despite his complaints of leg pain, Johnson did not refer Mr. Watkins to a provider. *Id*.

On August 28, 2019, Mr. Watkins's x-ray results revealed "[t]here is sequela of prior fraction s/p . . . intact hardware.  No new fractures.  Bullet fragments in the soft tissues."  ECF No. 84-1 at 28, ¶ 179.

On September 7, 2019, Mr. Watkins was again seen by Johnson for complaints that his medication for pain and blood pressure were not working.  ECF No. 84-1 at 29, ¶ 183.  According to Mr. Watkins, Johnson refused to treat him for his complaint and refused to refer him to a provider. *Id*.

On September 24, 2019, Mr. Watkins was seen by Marie Desir after he received multiple contusions to the left side of his face after someone repeatedly struck Mr. Watkins in the head, face, and left shin with "a sock filled with wet pain[t]" while he was asleep.  ECF No. 84-1 at 29, ¶ 185.  After Mr. Watkins was treated with ice, steri-strips, and Tylenol, Desir contacted Dr. Paul Matera who refused to authorize sending Mr. Watkins to the hospital for evaluation. *Id*.  Mr. Watkins states that he was instead placed in a suicide observation cell where he was unmonitored and left in excruciating pain, as well as dizziness, and intense headaches. *Id*. at ¶ 186.  Mr. Watkins adds that he was also "covered in blood for about 5 hours." *Id*.  When Sarah Johnson came to the area to hand out medication, she saw Mr. Watkins's appearance and immediately "told someone." *Id*.  Mr. Watkins was taken to see "defendant Raab," who ordered Mr. Watkins to be taken to the infirmary for "temporary medication" but ignored Mr. Watkins's complaints about his leg and the

failure to refer him to a specialist.  *Id*. at 29-30, ¶¶ 187-88.  While in the infirmary, Mr. Watkins explains he told every provider he saw about his leg and the recommendations of the radiologist, but they all refused to follow the recommendations or to refer him to a specialist.  *Id*. at 30, ¶ 189.

On October 5, 2019, Mr. Watkins submitted a sick call slip complaining of constant pain and swelling in both legs and that his blood pressure medicine was not working as he was having dizzy spells and headaches.  ECF No. 84-1 at ¶ 190.  Mr. Watkins was seen for this sick call slip on October 16, 2019 and was referred to a provider.  *Id*. at ¶ 191.  Despite that referral, Mr. Watkins was transferred to Roxbury Correctional Institution ("RCI") on October 31, 2019.  *Id*.

On November 11, 2019, Mr. Watkins submitted a sick call slip regarding his leg pain and dizzy spells.  ECF No. 84-1 at 30, ¶ 192.  He also reported that his Elavil prescription had expired and that he was not getting his blood pressure medication.  *Id*.  Mr. Watkins was seen on December 17, 2019 by Monica Stallworth for a chronic care visit.  *Id*. at ¶ 193.  At that time Mr. Watkins was not receiving his blood pressure medication and he informed Stallworth that despite taking lisinopril and Norvasc in the past, he still experienced headaches, blurred vision, and fatigue.  *Id*. He claims that despite his stated concerns, Stallworth prescribed the same medication.  *Id*. at 31, ¶ 193.  Additionally, Mr. Watkins states that Stallworth told him she was going to prescribe 50mg of Elavil even though Mr. Watkins told her he had recently been taking 125mg of Elavil without relief.  *Id*.

From December 18, 2019, to January 7, 2020, Mr. Watkins did not receive his blood pressure medication, or the Elavil prescribed by Stallworth.  ECF No. 84-1 at 31, ¶ 194.  Mr. Watkins was told after the first week had passed that Correct Rx Pharmacy Services, Inc. had refused to send his prescription.  *Id*.  Mr. Watkins spoke with Litell on December 30, 2019, who explained to him that his medications had been sent to a correctional facility where he had never

13

been housed before.  *Id*. at ¶ 195.  It was not until Kellie Boward submitted an early refill request form on January 5, 2020, that Mr. Watkins received his medication.  *Id*.

**Defendants' Response**

Defendants explain that Mr. Watkins was shot in his right leg in 2015, which required "an open reduction and internal fixation ("ORIF") of the right femur."  ECF No. 136-3 at 2, ¶ 3 (Decl. Muluget Akal, M.D.).  Mr. Watkins still has bullet fragments in his leg and suffers chronic pain related to the gunshot injury, "self-reported minor traumas to the left leg," and an alleged reinjury to the right leg.  *Id*.  Mr. Watkins additionally has a history of "polysubstance abuse involving prescription opioids, heroin, alcohol, and crack cocaine."  *Id*.  Mr. Watkins also experiences auditory hallucinations as a result of his "schizoaffective\psychotic disorder."  *Id*.  Mr. Watkins is monitored as a chronic care patient due to his chronic leg pain and other chronic medical conditions.  *Id*. at ¶ 4.  "Chronic care patients are regularly evaluated by physician and allied providers every 90 days or more frequently as needed for the management of their chronic disease processes and conditions."  *Id*.

According to Dr. Akal, treatment for chronic pain patients is individualized, requiring practitioners to distinguish the cause of the pain and the type of chronic pain involved.  ECF No. 136-3 at 2, ¶ 5.  He explains that "[m]usculoskeletal pain is most often caused by an injury to the bones, joints, muscles, tendons, ligaments, or nerves" while "[n]europathic pain often is the result of nerve damage or a malfunctioning nervous system."  *Id*.  "Nociceptive pain is caused by damage to body tissue and usually described as a sharp, aching, or throbbing pain."  *Id*.  Dr. Akal states that the "majority of chronic pain patients, will have life-long pain."  *Id*. at 3, ¶ 7.  The goal for chronic pain management is to therefore make the "pain manageable so as to prevent interference with physical function including the patient's regular activities of daily living ('ADL')."  *Id*.  Dr.

Akal notes that the "Center for Disease Control recommends that non-pharmacologic therapy and non-opioid pharmacologic therapy is the preferred treatment for chronic pain." *Id*. at ¶ 9. Additionally, for patients with a history of "polysubstance abuse" use of addictive pain-relieving medication "is not desirable." *Id*. Mr. Watkins has a history of polysubstance abuse. *Id*. at 5, ¶ 14.

Dr. Akal further explains that since 2017, the Department of Public Safety and Correctional Services ("DPSCS") began efforts to decrease the use of medications such as Neurontin and "other gabapentenoid medications" like Lyrica because they are often abused in prisons where there is a "reduced access to other illicit drugs that produce a better and/or longer sustained high." ECF No. 136-3 at 3-4, ¶ 10. The "diversion and illicit trade in these medications" endangers the health and safety of both correctional staff and inmates. *Id*. To accomplish the goal, providers are no longer prescribing these medications for "non-FDA approved conditions" absent exceptional circumstances. *Id*.

Dr. Akal states he first saw Mr. Watkins on December 14, 2017. ECF No. 136-3 at 4, ¶ 12. He notes that Mr. Watkins has a history of a gunshot wound to his right leg in 2015. *Id*. at ¶¶ 11, 13. When Dr. Akal saw him, Mr. Watkins had "an active prescription for Tylenol #3 (acetaminophen and codeine), and an expiring prescription for Baclofen 20mg twice daily." *Id*. at ¶ 12. The Tylenol #3 had been prescribed as a short-term prescription following the December 2, 2017 use of force incident during which Mr. Watkins claimed a correctional officer had reinjured his right leg. *Id*. The Baclofen, which is a muscle relaxant, was prescribed after Mr. Watkins reported an injury to his left leg while seated in a transport van on November 20, 2017. *Id*.

When Dr. Akal examined Mr. Watkins on December 14, 2017, there was no evidence of an acute injury to either of his legs. ECF No. 136-3 at 4, ¶ 13. Given that lack of evidence, Dr.

Akal concluded that a prescription for narcotic pain medication was unnecessary and advised Mr. Watkins that his current prescription for Tylenol #3 would not be renewed. *Id*. at 5, ¶ 13. To address his chronic right leg pain, Mr. Watkins was prescribed amitriptyline. *Id*. When Mr. Watkins asked for physical therapy, Dr. Akal declined to order it because Mr. Watkins did not report any issues with performance of ADL's and was able to walk. *Id*.

On December 22, 2017, Dr. Akal saw Mr. Watkins again when he came to the medical unit and demanded a refill of his Tylenol #3 prescription. ECF No. 136-3 at 5, ¶ 14. The prescription had just expired, and Mr. Watkins did not have an acute injury requiring that medication, so his request was denied. *Id*. Instead, Mr. Watkins's prescription for amitriptyline was renewed at a higher dose and he was offered NSAIDS which Mr. Watkins declined. *Id*. Although Dr. Akal felt that the condition of Mr. Watkins's right leg was stable and "no tangible benefit" would result, he referred Mr. Watkins for an orthopedic evaluation in the hope that speaking with such a specialist would reassure Mr. Watkins. *Id*. The consultation request was "deferred by utilization management in favor of continued conservative management" including regular evaluations and "pharmacological pain management." *Id*.

Dr. Akal saw Mr. Watkins again on January 12, 2018, when Mr. Watkins complained that the pain medication he was receiving was not working and he wanted something stronger. ECF No. 136-3 at 6, ¶ 15. Because there was no "clinical indication for narcotic medication," Mr. Watkins was offered NSAIDS instead, but he declined. *Id*. He was also offered Cymbalta to replace the amitriptyline he was taking, but he also declined that offer. *Id*. Mr. Watkins stated that he wanted physical therapy, but Dr. Akal informed him that there was no clinical indication for physical therapy as Mr. Watkins "demonstrated full range of motion in both the right hip and knee with full muscle mass and no obvious deformity." *Id*.

16

On February 23, 2018, Dr. Akal recalls that when he saw Mr. Watkins, he "reported his right thigh pain was bearable with the current level of amitriptyline and Baclofen." ECF No. 136-2 at 6, ¶ 16.  The prescriptions were continued, and another attempt was made to educate Mr. Watkins that there his condition did not require physical therapy.  *Id*.  Additionally, Dr. Akal saw no medical reason for Mr. Watkins to continue using a cane to walk.  *Id*.  This was based on Dr. Akal's observation of Mr. Watkins walking in the hallway without a cane and the absence of any balance issues or unsteadiness.  *Id*.  As an added bonus, Mr. Watkins's lower extremities would become stronger, and his pain would improve if he stopped using a cane.  *Id*.  After this encounter, Dr. Akal did not examine Mr. Watkins again.  *Id*.

Mr. Watkins receives regular medical attention through a chronic care clinic for his chronic pain.  ECF No. 136-3 at 7, ¶ 19.  In 2018, Mr. Watkins was seen in the chronic care clinic on May 22, July 17, September 7, and December 18.  *Id*.  In 2019, he was seen on March 11, June 18, and December 17.  *Id*.  In 2020, Mr. Watkins was seen March 12, October 20, and November 18.  *Id*.  In 2021, he was seen on February 25, April 21, July 22, July 28, and October 19.  *Id*.  At the time defendants filed their motion Mr. Watkins had been seen in the chronic care clinic on January 21, 2022.  *Id*.  The care provided by the chronic care clinic included evaluation of Mr. Watkins's pain and he was treated with "muscle relaxants (Baclofen), NSAIDS (Tylenol Extra Strength), analgesics (Capsaicin and Biofreeze), and neuropathic pain medications (Elavil\amitriptyline, Cymbalta and Tegretol)."  *Id*. at ¶ 20.  Additionally, Mr. Watkins was instructed on lifestyle modifications which included avoiding strenuous exercise, and he was instructed on "targeted physical activity" which was meant to improve his pain level.  *Id*.  When clinically appropriate, Mr. Watkins was provided with a cane.  *Id*.

Mr. Watkins was also seen twice (on August 12, 2020, and December 14, 2021) by a pain management team consisting of physicians, clinical pharmacy staff, and correctional staff.  ECF No. 136-3 at 7, ¶ 21.  During these two encounters, Mr. Watkins's prescriptions for pain medication were adjusted, but did not include the addition of narcotics as Mr. Watkins is "not considered an ideal candidate for long term narcotics."  *Id*.  At the time of these encounters Mr. Watkins was receiving Tylenol as needed, Baclofen, Tegretol, and Glucosamine-chondroitin as well as a cane for support.  *Id*.

With regard to Mr. Watkins's concern that a radiology report he received on September 21, 2018, mentions the possibility that he may have osteomyelitis, Dr. Akal explains that "radiology findings alone are insufficient to make the diagnosis of osteomyelitis."  ECF No. 136-3 at 9, ¶¶ 25, 26.  Rather, a "[d]iagnosis of osteomyelitis is made clinically with the assistance of laboratory testing and radiology imaging."  *Id*. at 8, ¶ 22.  Patients with acute osteomyelitis "may have local symptoms" that include redness of the skin, swelling, and warmth at the site of the infection as well as fever or chills.  *Id*. at ¶ 24A.[3]  Additionally, an "[e]levation of erythrocyte sedimentation rate ("ESR") and C-reactive protein ("CRP") with clinical symptomatology increases the index of suspicion for the condition."  *Id*. at ¶ 24B.

Dr. Akal states that during his encounters with Mr. Watkins there was no clinical basis for a suspicion that Mr. Watkins had osteomyelitis.  ECF No. 136-3 at 9, ¶ 27.  To the contrary, Dr. Akal's assessment of Mr. Watkins's leg pain was consistent with chronic pain and he notes that "[t]hroughout the remainder of 2018, [Mr.] Watkins' clinical condition related to his right leg pain stayed stable."  *Id*.  Additionally, x-rays of Mr. Watkins's right femur that were taken on December 5, 2017; August 21, 2019; March 4, 2020; and August 18, 2020, "revealed no acute osseous

---

[3]      There are two paragraphs numbered "24" on the declaration submitted by Dr. Akal.  To differentiate between the two, the first paragraph is cited as "24A" and the second is "24B."

abnormality and stable post-surgical hardware."  *Id*. at 9-10, ¶ 30.  "Lab results reveal[ed] that [Mr.] Watkins' ESR and CRP levels" were normal.  *Id*. at 10, ¶ 30.  More recently, the multi-disciplinary team noted on December 14, 2021, that Mr. Watkins's "latest lab and x-ray results were not suggestive of any 'activity or evidence of osteomyelitis.'"  *Id*. at ¶ 31.

## STANDARDS OF REVIEW

### A.    Motion to Dismiss

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222(4th Cir. Nov. 29, 2016) (per curiam).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*. at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*. at 165, 167.

**B.   Discovery**

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (*per curiam*); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir.

2015).   However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).   To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).   A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).   But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.   Although the Fourth Circuit has placed "'great weight'" on the Rule

56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

## C.    Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment.  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact.  *See Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."  *Id*. at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.

Because plaintiff is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## D.     Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access

24

to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839, 840; *see also Anderson*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken))

*see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).

**DISCUSSION**

The undisputed facts establish that: (1) Mr. Watkins sustained a gunshot wound to his right leg in 2015, requiring surgical placement of a rod in his thigh; (2) he was involved in a use of force incident which he claimed exacerbated the pain in his right leg; (3) an x-ray taken at Meritus Medical Center resulted in a report that raised the possibility that Mr. Watkins might have osteomyelitis; (4) at the time Mr. Watkins sustained the injury to his right leg, he was prescribed narcotic pain relief which was later discontinued; and (5) Mr. Watkins has been monitored in a chronic care clinic for both pain management and hypertension and has received medication for both conditions.  Underlying Mr. Watkins's claim regarding his leg is his steadfast belief that the recommendations made by the radiologist at Meritus Medical Center should have been followed by defendants.  Additionally, underlying Mr. Watkins's assertion that his hypertension has not been treated properly are the intermittent periods of time when he was not receiving medication for the condition and suffered symptoms as a result.

Mr. Watkins opposes defendants' motion on the ground that it is premature due to his need to engage in discovery.  ECF No. 146.  Specifically, he states that he needs to depose all of the defendants "that have relevance to the facts of this matter;" requires the names of the members of the multi-disciplinary pain management team "who the Wexford Defendants claim have followed [him] since August 2020" and all notes or memos concerning his treatment, and treatment for similarly situated inmates.  *Id*. at 2.  He also seeks to conduct discovery to obtain the names, memos, and notes of "those who made utilization management decisions" for his care and for the

care of "any other inmate and detainee similarly situated" and, in particular, the names of those who deferred orthopedic consultations in favor of conservative treatment. *Id*. He adds that he needs "expert testimony" to establish what the acceptable standard of care is for someone with symptoms of "stroke and acute and/or chronic Osteomyelitis" and to determine if the actions or inactions by defendants "were gross departures from the acceptable standard of care." *Id*. Mr. Watkins states he requires the "written policies of Wexford Health Services; Corizon Health, Meritus Medical Center, the University of Maryland, Correct Rx Pharmacy Services, the Division of Pretrial Detention and Services, the Division of Correction, the Department of Public Safety and Correctional Services, the Baltimore Central Booking and Intake Center, Maryland Reception Diagnostic and Classification Center "and any other detention center or prison [he] was incarcerated at [sic] during the events described…." *Id*. at 3.

The suggested discovery is overbroad and is not reasonably calculated to obtain potentially relevant evidence that would assist Mr. Watkins in opposing summary judgment. Federal Rule of Civil Procedure 26(b) governs the scope of discovery, and provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Mr. Watkins's assertions that he needs records of any other similarly situated inmate and detainee requires disclosure of confidential, privileged medical records and is information that would not tend to establish that these defendants exhibited a callous disregard for Mr. Watkins's serious medical need. Mr. Watkins has not raised an equal protection claim nor is this a class action lawsuit; therefore, any evidence regarding how similarly situated inmates were treated is not relevant to this case.

Obtaining an expert witness does not require a discovery; an opposing party is not obliged to provide expert testimony that would defeat summary judgment. Mr. Watkins's assertion that he needs access to various policies regarding medical treatment decisions has no relevance to his claim that the decisions made were improper in light of both his stated concerns and any observable symptoms. Moreover, Mr. Watkins's claims against Corizon, Wexford, Utilization Management Review Panel and Correct Rx Pharmacy were dismissed by this Court as conclusory claims without facts to support the existence of a specific or identifiable policy. ECF No. 100 at 24. Discovery of unidentified policies is therefore unnecessary for opposing summary judgment against Defendants Abiodun, Akal, Bickford, Jamison, Litell, Maximuangu, and Olawale.

As the plaintiff in this matter, Mr. Watkins must provide some evidence that, at a minimum, he suffered from a serious medical condition that was either recognized by medical staff as serious or was obvious to anyone who observed him at the time. *See Scinto*, 841 F.3d at 226 (subjective prong may be established by proof of actual knowledge or circumstantial evidence tending to establish actual knowledge). Mr. Watkins relies on the report written by the radiologist at Meritus Medical Center to support his claim. That report, however, was not written by a provider who had documented any clinical signs or symptoms of osteomyelitis. Rather, the report simply states that the condition was a possibility to investigate with further testing if Mr. Watkins was also exhibiting clinical symptoms of the disease. Defendants have repeatedly noted that Mr. Watkins exhibits no symptoms of osteomyelitis and have confirmed through repeat x-rays of his leg that he does not have a deformity or other abnormality requiring the sort of tests noted in the radiology report. *See* ECF No. 20 at 9 (Memorandum Opinion denying in part Motion for Temporary Restraining Order), ECF No. 32 at 2-4 (Response to Show Cause explaining why no biopsy was taken of Mr. Watkins's leg); ECF Nos. 32-2, 32-3, 32-4, 32-5, 32-6 and 32-7 (medical records). Mr. Watkins's

claim represents a disagreement with the medical treatment provided to him. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). Mr. Watkins has not alleged exceptional circumstances regarding the failure to provide him with the tests suggested in the radiology report. Likewise, the pain medication Mr. Watkins has been receiving may not be the medications he wants, but Defendants have explained their decision to give Mr. Watkins pain medication that does not present a possibility for abuse. Mr. Watkins's documented history of illegal drug use, including opioid abuse, as well as the need to eliminate the presence of medications in Maryland's prisons that have the potential for abuse, are valid reasons for declining Mr. Watkins's requests for those medications. The treatment Mr. Watkins has received for his right leg pain is not "capable of characterization as 'cruel and unusual punishment'" and therefore does not "present a colorable claim." *Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975).

With regard to Mr. Watkins's hypertension, his Amended Complaint demonstrates he was receiving medication as well as regular checks of his blood pressure and the medical providers were responsive to his complaints of headache, dizziness, and blurred vision. *See* ECF No. 84-1 at 14, ¶¶ 97-99; at 20, ¶ 136; at 26, ¶ 167; at 28, ¶ 176; at 31, ¶¶ 193 and 194. The claim that Mr. Watkins did not receive his blood pressure medication because it was sent to the wrong prison is a claim sounding in negligence which does not suffice for a constitutional claim. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though

such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one).  Mr. Watkins's claim regarding the treatment for his high blood pressure fails and Defendants are entitled to summary judgment in their favor on this claim as well as the claim regarding his leg pain.

## Conclusion

By separate Order which follows, Defendants Abiodun, Akal, Bickford, Jamison, Litell, Maximuangu, and Olawale are granted summary judgment in their favor.

Currently pending in this case are the following claims:[4] (1) the December 2, 2017 use of force incident; (2) the November 20, 2017 van transport incident; (3) the disciplinary proceedings held at BCBIC and Mr. Watkins's return to his cell after the hearing; and (4) the conditions of confinement at BCBIC.  The Defendants remaining are: Iesha Butler, Fatima Patterson, Thomas Williams, Ellice Hall, Sgt. Jackson, Officer Telp,[5] Officer Crawford, Captain Hines,[6] Officer Allen, Sgt. Solomon,[7] Charlene Hall, Clayton Raab, Talmadge Reeves, and Monica Stallworth. As a reminder, the operative complaint is the Amended Complaint docketed at ECF No. 84.  The remaining Defendants are directed to file a response to the claims against them within 28 days of the date this Memorandum Opinion and the accompanying Order issues.


Date:  6/17/2022

_____/s/_____
Julie R. Rubin
United States District Judge

---

[4]     Mr. Watkins's claims of retaliation, and violation of the ADA and the Rehabilitation Act were dismissed on September 23, 2021.  ECF No. 100 and 101.

[5]     Officer Telp is self-represented.

[6]     Captain Hines is self-represented.

[7]     Sergeant Solomon is self-represented.