# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **NAFIZ WATKINS,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | Case No. 1:20-cv-00208-JRR |
| **IESHA BUTLER,** *et al.,* | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendants Wexford Health Sources, Inc. ("Wexford"), Oluyemi Abiodun, M.D., Mulugeta Akal, M.D., Kelly Bickford, RN, Crystal Jamison, PA, Munjaja Litell, NP, Lum Maximuangu, NP, and Olufemi Olawale, NP's (collectively the "Wexford Defendants") Motion to Dismiss Omnibus Amended Complaint (ECF No. 173; the "Wexford Motion"); and Sergeant Bilal Ahmed, Officer Kevin Estep, Officer Shawntina McCall, Officer Philip Didawick, Officer Gerald Perry, Officer Brett Thrush, Officer Caleb Silver, Officer Kwadwo Kyeremeh, Officer Brandon Hutzell, Officer Dustin Wills, Officer Mills, Officer Iesha Butler, Officer Ellice Hall, Officer Charlene Powell, Officer Bobby Allen, Lieutenant Fatima Patterson, Officer Thomas Williams, Sergeant Shawanda Jackson, Officer Kemar Hines, and Officer Ronald Crawford's (collectively "DPSCS Defendants")[1] Motion to

---

[1] These Defendants are or were employees of the Maryland Department of Public Safety and Correctional Services ("DPSCS"). (ECF No. 205 at n.1.) The Complaint lists Officers Andray Nufea and Officer Brittain Butler as "newly added Defendants." (ECF No. 171, ¶ 1.) That notwithstanding, the DPSCS Motion asserts that the docket does not reflect that service was effectuated on these Defendants. Additionally, the Complaint names Officers Gerald Solomon and Davon Telp as Defendants. Although they were served, at the time the DPSCS Motion was filed, they had not made a request for representation. (ECF No. 205-3 at 2 n.2.)

Dismiss or, in the alternative, for Summary Judgment (ECF No. 205; the "DPSCS Motion").[2]   The

Omnibus Amended Complaint is referred to herein as the "Complaint."

The parties' submissions have been reviewed and no hearing is necessary.  Local Rule

105.6 (D. Md. 2023).  For the reasons that follow, by accompanying order, the Wexford Motion

will be granted in part and denied in part, and the DPSCS Motion will be granted in part and denied

in part.

## BACKGROUND[3]

This action arises out of multiple alleged physical assaults and indifference to Plaintiff's

medical condition during Plaintiff's custody with the Maryland Division of Correction ("DOC").

Plaintiff Nafiz Watkins is currently an inmate at the Maryland Correctional Institute — Jessup

("MCI-J.")  (Complaint, ECF No. 171, ¶ 3.)  On April 20, 2014, Plaintiff pled guilty to a single

count of carjacking and was sentenced to 12 years' incarceration, with all but two years suspended.

*Id.* ¶¶ 41-42.  On January 15, 2015, Plaintiff was alleged to have violated his probation conditions;

on December 11, 2018, Plaintiff's probation was terminated, and his suspended 10-year sentence

was reinstated.  *Id.* ¶¶ 44 and 46.  On July 14, 2015, Plaintiff was shot multiple times in his right

hip, which shattered his right femur.  *Id.* ¶ 45.[4]

---

[2] Plaintiff indicates in the Complaint that "[a]ll Defendants included in prior versions of the complaints filed in these now consolidated cases, but not listed as Defendants herein, are dismissed without prejudice."  (ECF No. 171 at 2 n.5.)  Accordingly, the court will only consider these listed Defendants as active in this case.

[3] The court accepts as true all well-pleaded facts in the Complaint for purposes of resolving the motions to dismiss. The court will include additional facts in its analysis as need for clarity.

[4] In September 2016, while at the Metropolitan Transition Center ("MTC"), Plaintiff was attacked by the man who shot him in 2015.  In connection with the incident, Plaintiff filed a lawsuit against several officers alleging they failed to prevent the attack and that he was wrongfully punished following the attack.  *See Watkins v. State of Maryland*, Case No. 17-cv-02893-CCB.  The case was ultimately dismissed and Plaintiff did not file an appeal. (ECF No. 171 ¶¶ 48-52.)

On October 19, 2017, Plaintiff was arrested and held at the Baltimore City Booking and Intake Center ("BCBIC.")  *Id.* ¶ 54.  Plaintiff alleges that although he was given a bottom bunk pass by medical staff because of his hip injury, he was not provided a bottom bunk.  *Id.* ¶¶ 55-58.

**October 29, 2017, Incident at BCBIC**

Plaintiff alleges that on October 29, 2017, he fell while climbing up to a top bunk bed. (ECF No. 171, ¶ 59.)  Plaintiff was taken for medical evaluation and given a bottom bunk pass. On October 30, 2017, Plaintiff received an Inmate Rule Violation Notice alleging he had threatened Defendant Butler.  *Id.* ¶ 61.  Due to the Inmate Rule Violation, Plaintiff was escorted onto the administrative segregation tier by Correctional Officers Fatima Patterson and Norman Hawkins.  *Id.* ¶ 62.  Once Plaintiff got to the administrative segregation tier, he informed Officers Patterson and Hawkins that he could not be placed on the tier because he recognized several individuals who were on his official enemies list.  *Id.* ¶¶ 63-64.  Officer Patterson responded by yelling and cursing at Plaintiff.  *Id.* ¶ 65.  Plaintiff asked Officers Patterson and Hawkins to call Captain Giles of the Internal Investigation Division; after getting off the phone with Captain Giles, Officers Patterson and Hawkins took Plaintiff to a different floor.  *Id.* ¶ 66-67.  Plaintiff alleges that Officer Patterson told him that he "skated this time" in response to the fact that Plaintiff could not be placed on the administrative segregation tier.  *Id.* ¶ 68.

**The Van Incident**

On November 20, 2017, Plaintiff along with other detainees were being driven to BCBIC in a DPSCS van following a court hearing.  (ECF No. 171, ¶ 70.)  Defendant Correctional Officers Charlene Powell and Andray Nufea were in the van during the transfer.  *Id.* ¶ 71.  Plaintiff alleges that Officer Powell was driving the van recklessly and made a sharp turn, which caused a stepping stool in the van to hit Plaintiff's leg and the row of seats in front of Plaintiff to collapse on his legs.

*Id.* ¶¶ 72-73.  The row of seats that collapsed on Plaintiff's legs was occupied by multiple inmates and the collapsed seat was left on Plaintiff's legs for ten to fifteen minutes.  *Id.* ¶¶ 74-75.  Plaintiff later learned that there was a pending work order for the van at the time the seat collapsed on his legs; the van should not have been used to transport detainees.  *Id.* ¶ 81.  On November 21, 2017, Plaintiff filed a grievance with the Residential Grievance Office regarding the van incident.  *Id.* ¶ 82.

Officer Powell eventually lifted the collapsed seat off of Plaintiff's legs and took him to medical.  Plaintiff was seen by Dr. Fasil Wubu.[5]  (ECF No. 171, ¶ 77.)  Dr. Wubu reviewed Plaintiff's medical records and was informed that he had a rod and bullet fragments in his leg from an unrelated previous incident; Plaintiff also informed Dr. Wubu that his right leg was in "tremendous pain."  *Id.* ¶¶ 78-79.  Dr. Wubu made adjustments to Plaintiff's pain medications but did not schedule a consult or additional examination.  *Id.* ¶¶ 79-80.

**Plaintiff is Moved to Administrative Segregation at BCBIC**

On November 23, 2017, Plaintiff received a second Inmate Rule Violation, which Plaintiff claims falsely accused him of pointing at Sgt. Ferdinand Atikpoh and making a sound to mimic a gun firing.  *Id.* ¶¶ 83-84.  The Inmate Rule Violation resulted in Plaintiff being moved to the administrative segregation tier.  *Id.* ¶ 85.  Plaintiff observed that the "grate to the window had been welded shut, and that there were metal shavings all around the window area and on the bed, and that dust and mold were being blown from the ventilation system in the cell."  (ECF No. 171, ¶ 88.)  On November 30, Plaintiff began experiencing respiratory trouble due to the conditions of his cell.  *Id.* ¶ 90.  Plaintiff was evaluated by medical staff and prescribed a nasal spray and

---

[5] The Wexford Motion asserts that Fasil Wubu, M.D., is named as a defendant for the first time in the Omnibus Amended Complaint (ECF No. 171), but he is not identified as a party on the court docket.  The Wexford Motion further asserts that Dr. Wubu has not been served with process.  The Wexford Motion argues that the only allegations against Dr. Wubu are from 2017, and, therefore, any action against him is time-barred.

nebulizer; the medical provider also requested that Plaintiff be moved from administrative segregation to the dormitory setting. *Id.* ¶¶ 90-92. The custody staff declined to transfer Plaintiff to a dormitory setting due to the pending Inmate Rule Violation. *Id.* ¶ 92.

On December 1, 2017, Plaintiff filed grievances with the Residential Grievances Office ("RGO") relating to the conditions of his cell. (ECF No. 171, ¶ 93.) On December 2, 2017, Plaintiff was having trouble and experiencing chest pain; he asked his custodians if he could go to medical to use the nebulizer he had been prescribed. *Id.* ¶¶ 94-95. Defendant Correctional Officer Ellice Hall told Plaintiff to stop complaining and did not take Plaintiff to medical for a nebulizer treatment. *Id.* ¶¶ 96-97. Plaintiff asked to speak to Officer Hall's supervisor, Defendant Sergeant Shawanda Jackson, regarding his request to go to medical for a nebulizer treatment. *Id.* ¶¶ 98-99. Sgt. Jackson did not allow Plaintiff to go to medical and threatened to pepper spray him if he did not return to his cell. *Id.* ¶¶ 100-101.

Sergeant Jackson then called for Defendant Officers Davon Telp, Ronald Crawford, Bobby Allen, Gerald Solomon, Kemar Hines and Brittain Butler. (ECF No. 171, ¶ 103.) Plaintiff asserts that these officers were part of the Baltimore Central Regional Tactical Unit and were among 25 DPSCS employees indicted in 2019 for mistreatment of pretrial detainees between 2016 and 2018. ¶¶ 104-105. According to Plaintiff, without warning, these officers grabbed him from the table he was seated at, carried him to his cell, and restrained his arms against the door of the cell; one offending officer kicked Plaintiff in the back of his right leg (the leg to which Plaintiff previously suffered a gunshot wound.) *Id.* ¶¶106-108. After the officer kicked Plaintiff in his leg, there was a visible protrusion underneath the skin of Plaintiff's right thigh area; there was no visible protrusion prior to Plaintiff being kicked in the back of the leg. *Id.* ¶¶ 112-13. Plaintiff was not sent to medical for emergency evaluation following the incident. *Id.* ¶ 116.

At approximately 6:00 p.m. on December 2, 2017, Plaintiff began to panic and hyperventilate. As a result, Plaintiff was escorted to medical in a wheelchair. (ECF No. 171, ¶ 118.) During the visit, Plaintiff's blood pressure was taken by Defendant Levon Joyner, which returned a reading of 170/90.[6] *Id.* ¶ 120. Plaintiff was examined by Defendant Dr. Oluyemi Abiodun and informed Dr. Abiodun that he needed a nebulizer treatment for his respiratory issues and that he had been kicked in the back of his leg. Plaintiff alleges that Dr. Abiodun made Plaintiff choose between having his leg or respiratory issued treated; Plaintiff chose his leg. *Id.* ¶ 121. Dr. Abiodun ordered x-rays for Plaintiff's leg, prescribed a walking cane, and altered Plaintiff's pain medication regiment. *Id.* ¶ 122. Following December 2, 2017, Plaintiff saw Dr. Abiodun several times over the next few days regarding the pain in his leg and "high blood pressure." *Id.* ¶ 135.

On December 14, 2017, Plaintiff saw Defendant Dr. Mulugeta Akal for a chronic care visit and informed the doctor that he had been kicked in his leg. *Id.* ¶ 137. At the time of the visit Plaintiff right leg was "swollen, tender and painful." (ECF No. 171, ¶ 138.) Dr. Akal did not document that Plaintiff had been kicked in the thigh or that there was any deformity to the right leg; however, Dr. Akal did not that Plaintiff's blood pressure was elevated and ordered blood work to determine the cause of same. *Id.* ¶ 139-40. Plaintiff's blood work showed high levels of creatine in Plaintiff's blood. Plaintiff did not receive any further treatment or testing. *Id.* ¶¶ 141, 143.

Throughout January 2018, Plaintiff continued to report pain in his right leg, although he had routine chronic care visits, Plaintiff claims the visits did nothing to alleviate his pain.

---

[6] The Wexford Motion asserts that the Complaint refers to a "Defendant Levon Joyner," but that person is not identified in the case caption and has never been made a party to this action. The Wexford Motion argues further that the Complaint was filed more than five years after Joyner is alleged to have seen Plaintiff and the action is therefore time barred as to Joyner. (ECF No. 173 at n.1.)

**February 14, 2018, Incident at the BCBIC**

On February 14, 2018, Plaintiff was taken escorted to a medical appointment. *Id.* ¶ 146. While being escorted to the medical appointment, Plaintiff alleges that Defendant Correctional Officer Shawntina McCall took Plaintiff to a room that he "did not recognize as a holding cell for inmates being taken to medical appointments," and that it did not have cameras. *Id.* ¶¶ 152, 154. Plaintiff further alleges that, once inside the room, Officer McCall choked Plaintiff, pinned him against the wall, punched Plaintiff in the face, and wrestled him to the ground. *Id.* ¶¶ 160, 162. Defendant Sergeant Bilal Ahmed, also present in the room, called for assistance, and then repeatedly hit Plaintiff in the head with a hard object. *Id.* ¶ 163. Approximately fifteen officers responded to the call for assistance and also assaulted Plaintiff. *Id.* ¶ 164. One officer grabbed Plaintiff by the legs and wrestled him to the ground. *Id.* ¶ 165. Defendant Officer Kevin Estep choked Plaintiff; some officers attempted to separate Officer Estep and Plaintiff, while others continued hitting Plaintiff with walkie-talkies and cans of mace/pepper spray. (ECF No. 171, ¶ 166.) During the entire incident, Plaintiff alleges he was restrained by handcuffs. *Id.* ¶ 160.

The next day, Plaintiff was served with a disciplinary charge that, according to Plaintiff, falsely accused him of verbally and physically assaulting Officer McCall. *Id.* ¶ 167.

**September 21, 2018, Incident at MCI-H**

In April 2018, Plaintiff was relocated to Maryland Correctional Institution — Hagerstown ("MCI-H"). On September 21, 2018, Defendant Officers Philip Didawick and Gerald Perry approached Plaintiff's cell and claimed they smelled wine. *Id.* ¶ 171. Plaintiff's cellmate had a bag of wine in the cell; Plaintiff attempted to give the wine to the officers, but they refused and instead searched the cell. *Id.* ¶¶ 172-73. Upon entering Plaintiff's cell, Officers Didawick and Perry punched Plaintiff in the stomach and kicked him in his legs. *Id.* ¶ 174. Officers Didawick

and Perry escorted Plaintiff to the showers to be stripped searched while the cell was searched by another officer.  (ECF No. 171, ¶¶ 175-76.)  Plaintiff alleges that during the strip search, Officer Perry grabbed his testicles and squeezed them to get Plaintiff to bend over.  Officer Didawick proceeded to search Plaintiff's rectal cavity for contraband; none was recovered.  *Id.* ¶¶ 182-83.

Following the incident, Plaintiff made a Prison Rape Elimination Act, 34 U.S.C. §§ 303, *et seq.* ("PREA"), report and was taken to the emergency room for evaluation.  *Id.*  ¶¶ 185-86. During his evaluation, Plaintiff also complained of the pain in his leg and the doctor ordered an x-ray.  *Id.* ¶ 187.  The radiologist who reviewed Plaintiff's x-ray noted "Extensive new bone formation is seen over previous traumatic region.  This may be related to sequela of chronic, healed osteomyelitis.  However, chronic recalcitrant or acute on chronic osteomyelitis are possible.  If there is a concern for osteomyelitis, consider 3 phase bone scan or tagged while [sic] blood cell scan.  MRI would be less sensitive given the adjacent metallic structures and IM rod."  *Id.* ¶ 191. After the evaluation, the final diagnosis was "Sexual Assault of Adult, Initial Encounter."  *Id.* ¶ 188.  Plaintiff gave a statement to a state prison investigator regarding the sexual assault incident; Plaintiff did not hear back from the investigator.  (ECF No. 171, ¶¶ 189-190.)

When Plaintiff was discharged, he was provided with follow-up care instructions regarding his right leg; the radiologist's impressions and post-visit report were provided to medical providers at MCI-H; and Plaintiff inquired about follow-up appointments.  *Id.* ¶¶ 192-96.  Defendant Kelly Bickford referred Plaintiff to a provider for follow-up regarding the sexual assault, but not for his leg. (ECF No. 171, ¶ 199.)

**September 22, 2018, Incident at MCI-H**

On September 22, 2018 — the day after the sexual assault — Plaintiff was brought to medical by Defendant Officers Caleb Silver and Brett Thrush, and examined by Defendant P.A.

8

Crystal Jamison.  *Id.* ¶¶ 200, 202.  Plaintiff complained to Jamison about his leg pain, but Jamison did not address his leg pain on the basis that Plaintiff was being seen for a PREA follow-up only. *Id.* ¶¶ 203-205.  In addition to not examining Plaintiff's leg, Jamison refused to schedule a follow-up or adjust Plaintiff's pain medication.  *Id.* ¶ 206.

According to Plaintiff, at the conclusion of his medical visit, because Plaintiff's leg condition made it difficult for him to walk, Officers Silver and Thrush forcibly dragged him out of medical, ramming his head into gates and walls along the way.  (ECF No. 171, ¶ 208.)  While headed back to the housing unit, Officers Silver and Thrush encountered Defendant Dustin Wills; the three men took Plaintiff to the basement of the housing facility, where it was well-known there were no cameras, and took turns punching, kicking, and slapping Plaintiff.  *Id.* ¶¶ 209-11.  The officers continued to escort Plaintiff back to his cell – forcing him to walk barefoot and with his clothing in such a disarray that his genitals were exposed.  Once they arrived at Plaintiff's cell, Officers Silver, Thrush, and Dustin pinned Plaintiff to the ground and beat him for five to ten minutes while he was handcuffed and the officers yelled at Plaintiff to "stop resisting."  *Id.* ¶¶ 216-18.  Officer Wills told Plaintiff, "I am going to uncuff you now.  Don't move until we leave this cell or we will break both your legs."  *Id.* ¶ 219.  After the officers exited Plaintiff's cell, Defendant Officer Mills told Plaintiff, "If you say anything to anybody.  We will come back and beat you to death."  *Id.* ¶ 221.

**November 8, 2018, Incident at MCI-H**

On November 18, 2018, while Plaintiff was using the "rolling phone,"[7] Defendant Officer Kwadwo Kyeremeh kicked the phone out of his hand causing Plaintiff's phone call with family members to disconnect.  (ECF No. 171, ¶ 223.)  When Plaintiff stuck his hand through the slot

---

[7] A "rolling phone" is a phone "brought from cell to cell so the inmates can make phone calls."  (ECF No. 171, ¶ 222.)

door in his cell to ask to speak to a supervisor, Officers Kyeremeh and Brandon Hutzell "slammed" the slot door on Plaintiff's arm, and repeatedly struck him with handcuffs and sprayed him with pepper spray.  Following the incident, Plaintiff was taken to medical and photographed, but the nurse refused to treat his arm injury or provide a decontamination shower to relieve the effects of the pepper spray.  *Id.* ¶¶ 227-36.  Officer Hutzell filed disciplinary charges against Plaintiff. Plaintiff claims that Officer Hutzell falsely alleged that Plaintiff assaulted him which led to use of force.  *Id.* ¶ 237.

* * *

The Complaint sets forth ten counts: (Count I) 42 U.S.C. § 1983-Excessive Use of Force in Violation of the Eighth Amendment December 2, 2017 Assault against Defendants Telp, Crawford, Allen, Solomon, Hines, and Butler in their individual capacities; (Count II) 42 U.S.C. § 1983-Excessive Use of Force in Violation of the Eighth Amendment February 14, 2018 Assault against Defendants Ahmed, McCall, and Estep in their individual capacities; (Count III) 42 U.S.C. § 1983-Excessive Use of Force in Violation of the Eighth Amendment September 21, 2018 Assault against Defendants Perry and Didawick in their individual capacities; (Count IV) 42 U.S.C. § 1983-Excessive Use of Force in Violation of the Eighth Amendment against Defendants Silver and Thrush in their individual capacities; (Count V) 42 U.S.C. § 1983-Excessive Use of Force in Violation of the Eighth Amendment against Defendants Kyeremeh and Hutzell in their individual capacities; (Count VI) 42 U.S.C. § 1985 – Conspiracy to Interfere with Civil Rights against All Defendant Correctional Officers; (Count VII) 42 U.S.C. § 1983-Deliberate Indifference in Violation of the Eighth Amendment against Wexford Health Sources, Inc. and the Wexford Health Sources, Inc. Defendants, and Corizon Health Inc., and the Corizon Health, Inc. Defendants, and YesCare; (Count VIII) Monell Claim 42 U.S.C. § 1983-Pattern or Practice Violation of the Eighth

Amendment against Wexford Health Sources, Inc., Corizon Health Inc., and YesCare; (Count IX) Battery against all Defendant Correctional Officers; and (Count X) Negligence against Defendants Nufea and Powell.  (ECF No. 171 at 32-48.)

The Wexford Defendants seek dismissal of the Complaint on the basis that Plaintiff fails to allege a serious medical need that any Wexford Defendant disregarded.  (ECF No. 173 at 2.) The Wexford Defendants further argue that Plaintiff fails to state a *Monell* claim because Plaintiff fails to allege facts tending to demonstrate that any person caused him to suffer a deprivation due to a Wexford policy or custom.  *Id.* at 3.  The DPSCS Defendants seek dismissal of the Complaint for failure to exhaust administrative remedies, failure to state a claim, and on the basis that Plaintiff's claims are time barred.  The DPSCS Motion further asserts that Defendant Powell is immune from suit.  In the alternative, the DPSCS Defendants move for summary judgment on all claims.  (ECF No. 205 at 1-2.)

## LEGAL STANDARD

### Federal Rule of Civil Procedure 12(b)(6)

"In *Twombly*,[8] the Court changed significantly how the legal sufficiency of a claim is to be measured when it is attacked under Rule 12(b)(6).  As one eminent scholar of federal civil procedure has said of *Twombly*: 'Notice pleading is dead.  Say hello to plausibility pleading.'" *Macronix Int'l Co. v. Spansion Inc.,* 4 F. Supp. 3d 797, 799-800 (E.D. Va. 2014) (quoting A. Benjamin Spencer, *Plausibility Pleading*, 49 B.C. L. REV. 431, 431-32 (2008)).  The "liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2) has been decidedly tightened (if not discarded) in favor of a stricter standard requiring the pleading of facts painting a 'plausible' picture of liability."  *Id.; see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d

---

[8] *Bell Atl. Corp., v. Twombly,* 550 U.S. 544 (2007).

250, 262 (4th Cir. 2009) (Jones, J., concurring in part, dissenting in part, and remarking that "*Twombly* and *Iqbal*[9] announce a new, stricter pleading standard.")

"The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244 (citing *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). The court, however, is ". . . not required to accept as true the legal conclusions set forth in a plaintiff's complaint." *Id.* (citing *District 26, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085 (4th Cir. 1979)).

## ANALYSIS

## I. THE WEXFORD MOTION

### A. 42 U.S.C. § 1983 (Counts VII and VIII)

Plaintiff asserts 42 U.S.C. § 1983 claims for Eighth Amendment violations against the Wexford Defendants (Counts VII and VIII). Section 1983 "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). "Section 1983 provides a cause of action for damages or equitable relief to remedy the deprivation of any rights, privileges or immunities secured by the Constitution and laws by a person acting under color of state law."

---

[9] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

*Rivero v. Montgomery Cnty., Md.*, 259 F. Supp. 3d 334, 345 (D. Md. 2017) (internal quotation marks omitted); *see West v. Atkins*, 487 U.S. 42, 48 (1988) (providing that, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and [] that the alleged deprivation was committed by a person acting under color of state law"); *Earle v. Shreves*, 990 F.3d 774, 777 (4th Cir. 2021) (explaining that "[a] person whose constitutional rights have been violated by a state official may bring an action seeking monetary damages against the official under 42 U.S.C. § 1983").

Claims brought pursuant to § 1983 require a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (holding that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). Therefore, *respondeat superior* liability does not exist under § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

## B.   Eighth Amendment — Medical Care (Count VII)

In Count VII, Plaintiff asserts a § 1983 claim against the Wexford Defendants for deliberate indifference to his medical needs in violation of the Eighth Amendment.

### 1.   Count VII against Wexford Health Sources, Inc.

The Wexford Defendants argue that Count VII should be dismissed as against Wexford because *respondeat superior* liability does not exist under § 1983.  (ECF No. 173-1 at 14.)

"It is well settled law that a claimant may not recover against a municipality on a *respondeat superior* theory under 42 U.S.C. § 1983." *Schiesser v. Wexford Health C.M.S. Corizon*,

2013 WL 4049723, at *2 (D. Md. Aug. 8, 2013) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–695 (1978)).  "Principles of municipal liability under § 1983 apply equally to a private corporation."  *Id.*  "Therefore, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*."  *Id.* (citing *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir.1999) and *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982)).  "Rather, a private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights."[10]  *Austin*, 195 F.3d at 728.

To the extent Plaintiff seeks to bring a § 1983 claim against Wexford, Plaintiff must ". . . adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights."  *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom").  Because the allegations contained in Count VII are based on the conduct of the individual Wexford Defendants, Count VII will be dismissed as against Defendant Wexford Health Sources, Inc.  *See Schiesser, supra*; *Brown v. Mitchell*, 308 F. Supp. 2d 682, 692 (E.D. Va. 2004) (noting that the fact that the guards violated the inmate's "rights, standing alone, is insufficient to establish an Eighth Amendment claim against the City").  Accordingly, the court will grant the Wexford Motion as to Count VII against Defendant Wexford Health Sources, Inc.

---

[10] As discussed more fully below, in *Monell v. Department of Social Services*, the Supreme Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  436 U.S. 658, 694 (1978).

## 2.    Count VII against Individual Wexford Defendants

The Wexford Defendants argue that Plaintiff fails to state a claim for deliberate indifference under 42 U.S.C. § 1983, because Plaintiff fails to allege facts showing the existence of a serious medical need and Plaintiff fails to allege that he was injured by a deprivation of his constitutional rights.  (ECF No. 173-1 at 7-8.)

"[A] 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'"  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). "In order to state a plausible Eighth Amendment deliberate indifference claim, the plaintiff is required to allege both 'an objective component and a subjective component.'"  *Griffin v. Mortier,* 837 Fed. Appx. 166, 170 (4th Cir. 2020) (quoting *Gordon,* 937 F.3d at 356).  "That is, the plaintiff must [allege] that the defendant prison official acted with 'deliberate indifference' (the subjective component) to the plaintiff's 'serious medical needs' (the objective component)."  *Gordon*, 937 F.3d 356 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (alteration in original).

***Serious Medical Need — Objective Component***

The Fourth Circuit has recognized that "[t]he objective component of a deliberate indifference claim is satisfied by a serious medical condition."  *Gordon*, 937 F.3d at 356.  "[A] medical condition is serious when it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks omitted).

The Wexford Defendants assert that Plaintiff does not allege facts that, if true, demonstrate a serious medical need that went unaddressed.  (ECF No. 173-1 at 10.)  Specifically, they argue that Plaintiff does not allege (i) that Defendant medical providers disregarded a belief or concern

that Plaintiff had active osteomyelitis; (ii) what combinations of signs and systems a patient with osteomyelitis might present; or (iii) that he presented with symptoms of osteomyelitis. *Id.* at 12. The Wexford Defendants also assert that Plaintiff does not allege facts that his allegedly serious medical need required a three-phase bone scan or tagged white blood cell scan. *Id.* at 11.

Plaintiff alleges that he was shot in his right leg in 2015 and that serial assaults by Defendant correctional officers exacerbated the trauma to his leg.  Plaintiff alleges that he repeatedly informed the Wexford Defendants that his "right leg was in pain, was deformed, was swollen and tender, and had been recent injured."  (ECF No. 171, ¶ 240.)  In addition to Plaintiff's allegations of ongoing pain, he alleges that during his visit to Meritus Medical Center, a radiologist examined x-rays of Plaintiff's right leg and opined that the bone formation over Plaintiff's previous gunshot injury "may be related to a sequela of chronic, healed osteomyelitis." *Id.* ¶ 191.  The radiologist further opined that "chronic recalcitrant or acute on chronic osteomyelitis are possible." *Id.*  The radiologist recommended a three-phase bone scan or tagged white blood cell scan if there was a concern of osteomyelitis.  Plaintiff alleges that Defendant Bickford's statement to him that "if you had osteomyelitis, you be dead," demonstrates the seriousness of the disease.

Plaintiff specifically alleges:

> The radiologist reported that there was "extensive new bone formation" that "may be related to sequela of chronic, healed osteomyelitis." The report also noted that "chronic recalcitrant or acute on chronic osteomyelitis are possible." The report further instructed "if there is concern for osteomyelitis, consider 3 phase bone scan or tagged white blood scan."

> In full, the report stated:

>> Frontal and lateral views of the femur were performed. There has been previous fracture repair with long intramedullary rod and 2 cannulated screw fixing the femur. There is significant bone expansion present with metallic fragments from previous shrapnel or gunshot. An underlying degree of

osteomyelitis cannot be fully excluded given the appearance to the bone through the proximal one 3rd of the shaft of the femur. This could be chronic health osteomyelitis. However, acute or chronic recalcitrant osteomyelitis are possible. There is no dislocation. The bones are appropriately mineralized. There is no bone destructive lesion. The knee and hip articulate normally. The visualized hemipelvis is intact. There is no significant osteoarthritis.

Impression: There is no acute fracture. Patient is status post fracture repair of the femur with prior gunshot or shrapnel. Extensive new bone formation is seen over the previous traumatic region. This may be related to sequela of chronic, healed osteomyelitis. However, chronic recalcitrant or acute on chronic osteomyelitis are possible. If there is concern for osteomyelitis, consider 3 phase bone scan or tagged white blood cell scan. MRI would be less sensitives given the adjacent metallic structures and IM rod.

The blood work revealed that Plaintiff still had a high level of creatinine in his blood, and that other markers were outside of the normal range.

Defendant Kelly Bickford was the first of the Wexford Health Defendants that Plaintiff saw after the trip to Meritus. When Plaintiff started to discuss the radiologists' impressions concerning the possibility of osteomyelitis, Defendant Bickford took a cursory glance at the papers from Meritus and simply told Plaintiff that he would be dead if he had osteomyelitis, and declined to follow the steps needed to rule out osteomyelitis.

The next Wexford Health Defendant that Plaintiff saw after the trip to Meritus was Defendant Crystal Jamison.

Plaintiff again brought up the concerns about his right leg. Defendant Jamison interrupted him, and yelled "you are only being seen for a PREA follow up because you claim you were raped." Defendant Jamison failed to examine Plaintiff's leg, and failed to follow up on Plaintiff's leg according to the instructions from Meritus. She also failed to consider the three phase bone scan or tagged white blood cell scan that was recommended.

The next Wexford Health Defendant that Plaintiff saw after the trip to Meritus was Defendant Maximuangu. Plaintiff asked Defendant Maximuangu when his follow up appointment with the orthopedic specialist, Dr. Oteyza, was scheduled for.

Defendant Maximuangu stated that the follow-up appointment had been canceled and provided no explanation.

The Wexford Health Defendants, even after learning in September of 2018 that Plaintiff had indications of possible osteomyelitis—and then later the Corizon Defendants— failed to further inquire into whether Plaintiff's ailments were being caused by underlying osteomyelitis.

Osteomyelitis can present as an acute condition, but can also present as a chronic, recalcitrant condition.

In 2018, the radiologist from Meritus clearly indicated that if Plaintiff had osteomyelitis, it would be of the chronic, recalcitrant variety.

The Meritus radiologist instructed the prison medical providers that, if there was a concern for osteomyelitis, Plaintiff should receive either a three-phase bone scan, or a tagged white blood cell count.

There was clear concern, because Plaintiff was submitted to repeated x-rays and blood tests.

(ECF No. 171, ¶¶ 248-60.)

The Wexford Defendants zero in on the radiologist's statement "if there is a concern for osteomyelitis" to support their argument that Plaintiff did not have a serious medical need because "no one was ever concerned that Watkins had any form of active osteomyelitis." (ECF No. 173-1 at 12.)  Osteomyelitis is defined as "an infectious usually painful inflammatory disease of bone that is often of bacterial origin and may result in death of the bone."  "Osteomyelitis." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/osteomyelitis. Accessed 13 Dec. 2023.  While the court appreciates the Wexford Defendant's interpretation of the radiologist's report, at the 12(b)(6) stage, the facts are viewed in the light most favorable to Plaintiff.  A disease that may result in bone death is objectively serious.  The radiologist's impressions coupled with Plaintiff's allegations of ongoing

pain in his right leg sufficiently allege a serious medical need at this stage of the litigation.  Courts have consistently found that allegations of ongoing pain due to trauma satisfy the serious medical need prong.  *See Clark v. Smith*, 2023 U.S. App. LEXIS 16180 *8 (4th Cir. Jun. 27, 2023) (finding that it was plausible that a torn Achilles tendon combined with the plaintiff's allegations of pain and swelling satisfied the serious medical need standard); *Brice v. Virginia Beach Correctional Ctr.*, 58 F.3d 101, 104-05 (4th Cir. 1995) (finding that trauma and pain as a result of a four-hour delay in treating injured jaw was a serious medical need).  Accordingly, the court finds that Plaintiff has sufficiently pled facts that he had a serious medical need.  Next, the court must determine whether Plaintiff alleged deliberate indifference on the part of the Wexford Defendants.

***Deliberate Indifference — Subjective Component***

The subjective component is met by demonstrating a defendant's deliberate indifference. *Gordon v. Schilling*, 937 F.3d 348, 357 (4th Cir. 2019).  "The Supreme Court has explained that 'deliberate indifference entails something more than mere negligence,' but the standard 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "In the context of a claim related to the denial of medical treatment or a delay in providing such treatment, 'a defendant acts with deliberate indifference if he had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Griffin,* 837 Fed. Appx. at 170 (quoting *Gordon,* 937 F.3d at 357).  "Mere disagreements between an inmate and prison medical staff over the inmate's medical care, however, generally do not establish deliberate indifference."  *Id.* (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).

The Wexford Defendants assert that the Complaint fails to adequately plead they were deliberately indifferent to Plaintiff's alleged serious medical need because Plaintiff does not allege

facts showing the existence of a need for specialty orthopedic care, a three-bone scan or tagged white blood cell scan.  (ECF No. 173-1 at 10-11.)  The Wexford Defendants argue, absent a need for these medical interventions, there can be no deliberate indifference.  *Id.* at 11.  The Wexford Defendants aver that Plaintiff was given pain medication for his leg pain and that, although he did not get specialty orthopedic care or the bone and blood scans, these facts do not amount to deliberate indifference because the Eighth Amendment does not guarantee prisoners their choice of healthcare or medication.  *Id.* at 10.

Plaintiff alleges that, despite ongoing pain and deformity in his leg, he was not offered testing or treatment aside from adjustments to his pain medications, x-rays, and medical orders that he be front cuffed and provided a walking cane.  The court is required to assess Plaintiff's allegations with respect to each individual Wexford Defendant's deliberate indifference.  *See Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999) (noting that each individual's subjective deliberate indifference must be examined separately).  Accordingly, the court addresses the allegations against each remaining Defendant in turn.

With Respect to Dr. Abiodun, Plaintiff alleges:

> Plaintiff was seen at medical by Defendant Oluyemi Abiodun. Plaintiff told Defendant Abiodun that he needed the nebulizer treatment for his respiratory issues that he had requested hours earlier, and also told Defendant Abiodun that he had been kicked in the right thigh, and could not walk.

> Defendant Abiodun forced Plaintiff to choose whether she would treat the breathing complications or the leg. Plaintiff chose to have his leg treated because he was barely able to walk.

> Defendant Abiodun ordered that x-rays be taken of Plaintiff's right leg, prescribed Plaintiff a cane, increased Plaintiff's pain medication, and added a narcotic medication as well.

20

> Defendant Abiodun declined to take any other steps, despite the fact
> that Plaintiff was displaying symptoms of possibly life-threatening
> hypertension, and an acute injury to his right leg.

(ECF No. 171, ¶¶ 119, 121-23.)  While Plaintiff's allegations make it plausible that Dr. Abiodun

knew of Plaintiff's medical condition, they do not support a finding that Dr. Abiodun disregarded

Plaintiff's medical needs.  Indeed, Plaintiff alleges several medical interventions that Dr. Abiodun

ordered in response to his leg pain.  Although Plaintiff alleges that Dr. Abiodun "declined to take

any other steps," Plaintiff does indicate what those steps would have, or should have, been.

Deliberate indifference contemplates a disregard of Plaintiff's medical symptoms and refusal to

treat the same.  *Rivera v. Gupta*, 836 F.3d 839, 841-42 (7th Cir. 2016) (finding refusal to treat

numbness and pain in leg and foot that made walking difficult was deliberate indifference);

*Johnson v. Hardin County*, 908 F.2d 1280, 1284-85 (6th Cir. 1990) (holding that alleged failure to

provide pain medication, crutches, and bedding to inmate with compound foot fractures defeated

summary judgment for defendants on deliberate indifference claim).  Plaintiff's allegations, taken

as true, completely refute any notion that Dr. Abiodun disregarded Plaintiff's complaints or refused

to provide any treatment.  Accordingly, the second prong fails as to Defendant Dr. Abiodun and

Count VII will be dismissed against him on this basis.

> With respect to Dr. Akal, Plaintiff alleges:

> On December 14, 2017, Plaintiff saw Defendant Mulugeta Akal for
> a chronic care visit. Plaintiff explained to Defendant Akal that his
> right leg had been injured almost two weeks earlier when he had
> been kicked in his right femur.

> Plaintiff's right leg, at the time he saw Defendant Akal, was swollen,
> tender, and painful.

> Defendant Akal failed to take any meaningful action to ensure
> Plaintiff's right leg received the attention it needed, and on a medical
> record, failed to document Plaintiff's report that he had been kicked
> in the right thigh, and that had caused the deformity to the right leg.

> Defendant Akal noted during these appointments that Plaintiff's blood pressure was elevated, and at one point, ordered blood work to determine the cause of the elevated blood pressure.
>
> The blood work showed an abnormally high level of creatinine in Plaintiff's blood.
>
> Creatinine is a waste byproduct created by the muscles. Increased levels of creatinine in the blood indicate the body's inability to correctly dispose of the creatinine through the urine.
>
> Despite the high level of creatinine in his blood, Plaintiff did not receive any treatment or further testing.

(ECF No. 171, ¶¶ 137-43.)   Here, Plaintiff clearly alleges that Dr. Akal knew of his medical condition.  He was seeing Dr. Akal for chronic care visits and his right leg was swollen when he saw Dr. Akal.  That notwithstanding, Plaintiff's allegations regarding Dr. Akal suffer the same fate as those regarding Dr. Abiodun.  Plaintiff has not alleged facts that support a finding that Dr. Akal disregarded Plaintiff's serious medical need or outright refused to treat Plaintiff.  Instead, Plaintiff again alleges medical interventions ordered by Dr. Akal based on his examination of Plaintiff.  Dr. Akal's alleged "failure to take meaningful action to ensure Plaintiff's right leg received the attention it needed" does not rise to deliberate indifference under the Eighth Amendment. Accordingly, the Wexford Motion will be granted as to Count VII against Dr. Akal.

With respect to Nurse Bickford, Plaintiff alleges:

> Copies of the radiologist's impression and the post-visit report were provided to Defendant Kelly Bickford when Plaintiff arrived back at MCI-H.
>
> Plaintiff told Defendant Bickford that his right leg was hurting, and asked when he would be seen for a follow up appointment to address the "extensive new bone growth" and the possibility of osteomyelitis.

> Defendant Bickford stated bluntly "if you had osteomyelitis, you'd be dead," and declined to schedule any follow up appointments related to Plaintiff's right leg.
>
> Defendant Bickford knew from the radiologist impressions that there was a possibility that Plaintiff had some form of osteomyelitis, but declined to follow the instructions for follow up care.
>
> Her statement also indicated her familiarity with how osteomyelitis can be incredibly dangerous.
>
> Defendant Bickford then referred Plaintiff to a provider for a follow up appointment related to the sexual assault, but failed to provide any sort of follow up care for Plaintiff's right leg.
>
> In August of 2018, Plaintiff saw Defendant Munjanja Litell and Defendant Kelly Bickford. Plaintiff informed both Defendants Litell and Bickford of his worsening leg pain but they refused to order any tests or refer Plaintiff to an orthopedic specialist.

(ECF No. 171, ¶¶ 194-99, 245.)

Plaintiff alleges that Nurse Bickford received a copy of the radiologist's report and received complaints from Plaintiff about his leg pain. The court is satisfied that Plaintiff has alleged that Nurse Bickford knew about his serious medical condition. Further, Plaintiff's allegations show that Nurse Bickford refused to get Plaintiff any testing regarding osteomyelitis, refused to schedule follow-up appointments, and did not order any medical interventions to address Plaintiff's medical needs. Based on Plaintiff's allegations, it is plausible that Nurse Bickford disregarded Plaintiff's medical needs and refused to get him treatment. The Wexford Motion will be denied as to Nurse Bickford on this basis.

With respect to Physician's Assistant Crystal Jamison, Plaintiff alleges:

> At medical, Plaintiff was seen by Defendant Crystal Jamison.
>
> Plaintiff informed Defendant Jamison that at Meritus Medical Center, x-rays showed extensive new bone formation, and the radiologist who read the x-ray indicated that there were indications that Plaintiff may have chronic or recalcitrant osteomyelitis.

> Plaintiff also asked Defendant Jamison whether the appointment with Dr. Oteyza had been scheduled.
>
> Defendant Jamison interrupted Plaintiff and said "You are only being seen for a PREA follow-up because you claim you were raped."
>
> Defendant Jamison, like Defendant Bickford, completely ignored Plaintiff's complaint related to his leg.
>
> Defendant Jamison refused to examine Plaintiff's injured right leg, schedule a follow-up appointment, adjust his pain medication, provide Plaintiff with a new copy of front cuff orders, or give Plaintiff his cane back.

(ECF No. 171, ¶¶ 202-206.)   Similar to the court's analysis regarding Nurse Bickford, here, Plaintiff alleges that Jamison knew about his serious medical condition.  Further, Plaintiff alleges that Jamison refused to order testing regarding osteomyelitis, refused to schedule follow-up appointments, and refused to order medical interventions, including those which had previously been administered to address Plaintiff's medical needs.  Based on Plaintiff's allegations, it is plausible that Jamison completely refused to treat Plaintiff's leg pain despite her knowledge of same.  Accordingly, the Wexford Motion will be denied as to Defendant Jamison on this basis.

With respect to Defendant Nurse Practitioners Munjaja Litell, Lum Maximuangu, and Olufemi Olawale Plaintiff alleges:

> In August of 2018, Plaintiff saw Defendant Munjanja Litell and Defendant Kelly Bickford. Plaintiff informed both Defendants Litell and Bickford of his worsening leg pain but they refused to order any tests or refer Plaintiff to an orthopedic specialist.
>
> In September of 2018, Plaintiff saw Defendant Lum Maximuangu. Plaintiff informed Defendant Maximuangu of his worsening leg pain, that the pain medication was not helping. Defendant Maximuangu also failed to order any diagnostic testing or any specialty care or evaluation of any kind.
>
> In May and June of 2018, Plaintiff saw Defendant Olawale repeatedly for the worsening pain in his right leg. Defendant

> Olawale never did anything more than increase Plaintiff's medications.
>
> All of Defendant Olawale's notes failed to include any of Plaintiff's complaints of a deformity or the fact that Plaintiff had been kicked months earlier.

(ECF No. 171, ¶¶ 242-43, 245-46.)  With respect to the Defendant Nurse Practitioners, Plaintiff's allegations are sufficient to support a finding that these Defendants had knowledge of his medical condition.  That notwithstanding, Plaintiff's allegations do not support a finding that the Nurse Practitioners were deliberately indifferent.  Plaintiff's allegations do not sound in refusal to treat or disregard of his medical needs; rather, Plaintiff's allegations attack the type of treatments he did not receive.  While Plaintiff may have been unhappy that the Nurse Practitioner's did not order particular testing or treatment, he does not allege that they did not provide treatment at all.  Merely because the Nurse Practitioners declined to order the medical interventions Plaintiff desired does not equate to the deliberate indifference required to state an Eighth Amendment Claim.  Accordingly, Count VII will be dismissed against Defendants Litell, Maximuangu, and Olawale on this basis.  The Wexford Motion will be granted as to Count VII against Defendants Litell, Maximuangu, and Olawale.

### 3.   *Monell* — Pattern and Practice  (Count VIII)

Count VIII of the Complaint sets forth a § 1983 *Monell* claim against Wexford Health Sources, Inc., for a pattern or practice in violation of the Eighth Amendment.

A local government entity is subject to suit under § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  In *Monell,* the Supreme Court held that an individual may recover in a 1983 claim against a municipality for violation of constitutional rights by officials of the municipality if the unconstitutional action was engaged in pursuant to an official policy or custom of the municipality.  *Id.* at 690-91.  The *Monell* Court explained that, "when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694.

Of importance in the present case, "*Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers." *Green v. Obsu*, 2020 WL 758141, at *10 (D. Md. Feb. 13, 2020) (citing *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999)).   "Standards applicable to municipalities are also applicable to private corporations acting under color of state law." *Id.* (citing *Rodriguez*, 338 F.3d at 355).

"[A] viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Id.* (citing *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403, 117 (1997)) (citations omitted).   "An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citations omitted).   In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*   "Outside of such formal decision making channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Carter v. Morris*, 164 F.3d 215,  218 (D. Md. 1999) (quoting *Monell*, 436 U.S. at 691).

Wexford argues that Plaintiff does not allege any examples or concrete details that Wexford has an unconstitutional policy or custom.  (ECF No. 173-1 at 14-15.)  The onus Wexford places on Plaintiff at the pleading stage is too high.  "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."  *Owens v. Balt. City State's Atty's. Off.*, 767 F.3d 379, 403 (4th Cir. 2014).  For Plaintiff's *Monell* claim "to survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege facts which, if true, 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678) (citations omitted).  "The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high."  *Id.* (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.)  A plaintiff fails to state a claim only when he offers 'labels and conclusions' or formulaically recites the elements of his § 1983 cause of action.  *Iqbal*, 556 U.S. at 678.

The Complaint alleges:

> Upon information and belief, the Wexford Health Defendants and then the Corizon Health Defendants had a policy where inmates' medical issues would routinely be ignored or minimized in order to cut costs.
> This practice resulted in the continual denial of specialty care to the Plaintiff, and the denial of simple diagnostic tests and treatments.
>
> It is more profitable for the prison health contractors to fail to diagnose an inmate's medical condition, because any diagnosis requires treatment, which is expensive.
>
> While prison health contractors are not required to secure the best, most advanced expensive medical treatment for those in their care, they may not ignore well-documented evidence of a potentially serious medical issue to minimize their costs.
>
> ***
>
> At all times relevant, Wexford Health Sources, Corizon Health Inc, and YesCare maintained an official policy and/or custom of ignoring inmates health concerns, and denying treatment and diagnostic tests for inmates with serious medical issues. This policy of avoiding treatment and diagnostic tests allowed Wexford,

Corizon, and YesCare to avoid the expenses that would be incurred in providing necessary treatment to inmates suffering from debilitating health conditions, and thus maximize their profits on the contracts with DPSCS that were worth hundreds of millions of dollars.

This unconstitutional policy of ignoring, undertreating, and underdiagnosing medical issues caused a violation of the Plaintiff's constitutional rights.

Plaintiff is one of an unknown number of incarcerated persons in Maryland, and across the country who have suffered constitutional violations as a result of Wexford, Corizon, and YesCare's policy and practice of avoiding treatment and securing diagnosis for those in their care.

The evidence that Wexford, Corizon, and YesCare have maintained such policies is apparent in the hundreds of lawsuits filed against these entities across the country, by individuals with life threatening medical conditions, who were routinely denied treatment and diagnostic testing even when the need for treatment was patently obvious.

In addition to the reports of similar denials of care in the media and in lawsuits filed against these entities, Plaintiff is personally aware of inmates who have, like him, been routinely denied medical care and diagnostic testing services.
This conduct amounts to a consistent, widespread practice of necessary medical care to inmates.

(ECF No. 171, ¶¶ 271-74 and 386-91.)

Plaintiff's allegations are more than bare labels or conclusions; rather, Plaintiff alleges that it is the policy and practice of Wexford to refuse necessary specialty care to inmates so that it can cut down on expenses.  Plaintiff further alleges that he personally knows other inmates who have been routinely denied specialty medical care by Wexford.  Plaintiff does not merely allege that Wexford has an "unconstitutional policy or custom;" he alleges details about the policy and the purported reasoning behind Wexford's alleged systemic and widespread denial of medical care. Plaintiff's allegations, taken as true, plausibly allege that Wexford has a policy of refusing to order

specialty care for inmates as a way to reduce expenses.  Accordingly, the Wexford Motion will be denied as to *Monell* claim set forth in Count VIII.

## II.     THE DPSCS MOTION

### A.     <u>Legal Standards</u>

**<u>Federal Rule of Civil Procedure 12(d)</u>**

The DPSCS Defendants move to dismiss under Federal Rule of Civil Procedure 12(b) or, in the alternative, for summary judgment under Rule 56.  "A motion with this caption implicates the court's discretion under Fed. R. Civ. P. 12(d)."  *Snyder v. Md. Dep't of Transp.*, No. CCB-21-930, 2022 WL 980395, at *4 (D. Md. Mar. 31, 2022).  Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d).  "Pursuant to Rule 12(d), the Court has discretion to determine whether to accept evidence outside the pleadings, and thus convert a Rule 12(b) motion to a Rule 56 motion."  *Coleman v. Calvert Cnty.*, No. GJH-15-920, 2016 U.S. Dist. LEXIS 130420, at *8 (D. Md. Sept. 22, 2016) (citations omitted).

The DPSCS Motion raises several arguments, the most prevalent that Plaintiff failed to exhaust his administrative remedies before filing suit.  Plaintiff asserts that whether or not DPSCS's exhaustion arguments are analyzed under Rule 12(b)(6) or Rule 56, the DPSCS Motion should be denied.  *Id.*  The parties attach a number of exhibits to their filings.  That notwithstanding, the court does not need to consider any exhibits outside the pleadings to resolve the pending motion.  Therefore, at this juncture, the court declines to consider the exhibits outside of the pleadings and thereby convert the DPSCS Motion to one for summary judgment.  *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 437 (D. Md.

2011) (treating the defendant's Rule 12(b)(6) or, in the alternative, Rule 56 motion as a 12(b)(6) motion because the court did not need to "consider matters outside the pleadings in resolving this motion") *aff'd* 684 F.3d 462 (4th Cir. 2012).   The court will analyze the DPSCS Motion under the applicable Rule 12(b)(6) standard.

   **B.**   **Analysis**

      **1.**   **Exhaustion — Prison Litigation Reform Act, 42 U.S.C. § 1997e**

The DPSCS Defendants argue that Plaintiff's §§ 1983 and 1985 claims set forth in Counts I through VI should be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA").  (ECF No. 205-3 at 11.)  Plaintiff argues that exhaustion is an affirmative defense that is not a basis for dismissal under Rule 12(b)(6).  (ECF No. 213 at 7.)[11]

Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C.] section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).   "This exhaustion requirement means what it says: 'There is no question that exhaustion is mandatory under the PLRA[.]'"  *Williams v. Carvajal*, 63 F.4th 279, 285 (4th Cir. 2023) (quoting *Jones v. Bock*, 549 U.S. 199, 211 (2007)).  "And that mandatory language means a court may not excuse a failure to exhaust, even to take special circumstances into account."  *Ross v. Blake*, 578 U.S. 632, 639 (2016).  The PLRA's exhaustion requirement "applies to all 'suits about prison life, whether they involve general circumstances or particular episodes,'

---

[11] Plaintiff also argues that "[b]ecause dismissal based on the affirmative defense cannot be granted as a matter of law the court should move its analysis under Rule 56."  (ECF No. 213 at 7.)  Plaintiff argues that, under Rule 56, the DPSCS Motion still fails because there are genuine disputes of material fact as to whether Plaintiff exhausted the administrative remedies available to him.  The court does not reach Plaintiff's contentions on this point, as it declines to convert the DPSCS Motion to one for summary judgment.

and whether they fall 'under § 1983 or any other Federal law.'" *Williams*, 63 F.4th at 285 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  "Exhaustion, moreover, must be 'proper,' which means that 'a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition for bringing suit in federal court.'" *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).  "The PLRA requires a prisoner to exhaust administrative remedies 'regardless of the relief offered through administrative procedures.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 741 (2001)).

The court finds instructive *Pinkett v. Crowder*,  No. ELH-13-2509, 2014 WL 3571802, at *9 (D. Md. July 18, 2014).  There, the defendants argued that the plaintiff failed to exhaust his administrative remedies.  *Id.* at *8.  In declining to dismiss or grant summary judgment to the defendants on the basis of failure to exhaust, the *Pinkett* court explained:

> Ordinarily, a prisoner's compliance with the PLRA's exhaustion requirement cannot be resolved by way of a Rule 12(b)(6) motion. This is because "failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Bock*, 549 U.S. at 216. The Supreme Court's ruling in *Bock* was in accord with the "settled general rule" that "the burden of proving an affirmative defense is on the party asserting it." *McNeill v. Polk*, 476 F.3d 206, 220 n. 3 (4th Cir.), *cert. denied*, 552 U.S. 1043, 128 S. Ct. 647, 169 L.Ed.2d 516 (2007). As discussed earlier, a Rule 12(b) (6) motion typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," unless such a defense can be resolved on the basis of the facts alleged in the complaint. *Edwards*, 178 F.3d at 243 (internal quotation marks omitted).

> Consistent with these principles, the *Bock* Court stated that a prisoner suit conceivably could be dismissed under Rule 12(b)(6) for failure to exhaust administrative remedies if the "allegations in the complaint suffice to establish that ground." *Bock*, 549 U.S. at 215. But, that will be the rare case, because "the burden of pleading exhaustion in a case covered by the PLRA" is not placed "on the prisoner." *Id.* at 211; *accord Anderson*, 407 F.3d at 682 ("While it seems unlikely that the failure to exhaust administrative remedies will often be apparent from the face of a complaint, it is certainly

possible that a complaint may clearly show that an inmate has not exhausted his administrative remedies.").

Moreover, administrative remedies must be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

2014 WL 3571802, at *9-10; *see Anderson v. XYZ Corr. Health Servs.*, 407 F.3d 674, 682 (4th Cir. 2005) (explaining that "[w]hile it seems unlikely that the failure to exhaust administrative remedies will often be apparent from the face of a complaint, it is certainly possible that a complaint may clearly show that an inmate has not exhausted his administrative remedies").

The Complaint alleges:

> As an inmate, Plaintiff was entitled to equal protection of the laws, and specifically, the Eighth Amendment's prohibition on cruel and unusual punishments. He was entitled to avail himself of the judicial system when his administrative remedies were exhausted and had provided no relief.

(ECF No. 171, ¶ 351.)   Additionally, the Complaint contains several allegations that Plaintiff submitted grievances to the RGO in connection with the van transportation incident, as well as the "unsanitary" conditions of his cell.   (ECF No. 171, ¶¶ 82, 83, 93.)   Taking the allegations in the Complaint as true, the Complaint does not "clearly show" that Plaintiff did not exhaust administrative remedies.   Indeed, the Complaint alleges the opposite.   Plaintiff alleges he sought judicial review after he pursued administrative remedies to no avail.   Because the allegations in the Complaint do not unequivocally demonstrate that Plaintiff failed to exhaust, coupled with the fact the DPSCS Defendants bear the burden of showing Plaintiff did not exhaust his administrative remedies, the DPSCS Motion as to Counts I through VI will be denied.

### 2.   Exhaustion — Maryland Prisoner Litigation Act

The Complaint sets forth a claim for battery (Count IX) against all Defendant Correctional Officers and a claim for negligence (Count X) against Defendants Nufea and Powell.   The DPSCS Defendants argue that both of Plaintiff's state law claims should be dismissed for failure to exhaust administrative remedies under the Maryland Prisoner Litigation Act ("MPLA").   (ECF No. 205-3 at 20.)   Plaintiff does not raise any new exhaustion arguments with respect to his state law claims.

"In 1997, the [Maryland] General Assembly enacted the Prisoner Litigation Act (PLA) in order to complement the Federal Prison Litigation Reform Act (42 U.S.C. § 1997e), enacted by Congress a year earlier." *Evans v. State*, 396 Md. 256, 330 (2006).   MD. CODE ANN., CTS. & JUD. PROC. ("CJP") § 5-1003(a) provides that, "[a] prisoner may not maintain a civil action until the prisoner has fully exhausted all administrative remedies for resolving the complaint or grievance."   Pursuant to the PLA, a prisoner is required to attach to his initial complaint "proof that administrative remedies have been exhausted," "including proof that the prisoner filed a complaint or grievance with the appropriate agency, proof of the administrative disposition of the

complaint or grievance, and proof that the prisoner appealed the administrative disposition to the appropriate authority, including proof of judicial review."  CJP § 5-1003(b); *Evans*, 396 Md. at 330.

The Supreme Court of Maryland highlighted the differences between the MPLA and the PLRA:

> The Federal Act imposes no pleading requirement on prisoners to allege exhaustion of administrative remedies. Failure to exhaust is an affirmative defense to the action that must be pled and shown by the defendant. *See Mitchell v. Horn*, 318 F.3d 523 (3rd Cir. 2003); *Abney v. McGinnis*, 380 F.3d 663 (2nd Cir. 2004). The Maryland statute is more onerous. As noted, CJP § 5-1003(b) requires the prisoner to attach to the initial complaint "proof that administrative remedies have been exhausted," including proof (1) that the prisoner filed a complaint or grievance with the appropriate agency, (2) of the administrative disposition, and (3) that the prisoner has "appealed" the administrative disposition to the appropriate authority, including proof of judicial review. If the prisoner has, in fact, exhausted his or her administrative remedies but has simply failed to attach proof of that fact, § 5-1003(b)(3) requires the court to "dismiss the case without prejudice and grant the prisoner leave to amend the complaint and to provide the proof necessary to demonstrate that the prisoner has fully exhausted the administrative remedies." If the prisoner has *not* actually exhausted available administrative remedies, § 5-1003(c) requires the court to dismiss the action without leave to amend ("A court shall dismiss a civil action if the prisoner filing the action has not completely exhausted the administrative remedies.").

*Evans*, 396 Md. at 335-36.

Here, Plaintiff does not attach proof that he exhausted his administrative remedies to the operative Complaint or any previous complaints.  Plaintiff does attach to his opposition documentation related to the administrative process, but, as set forth above, the court declines to consider matters outside of the pleadings to resolve the pending motion.  The court may, however, consider matters expressly referenced in the complaint without converting the DPSCS Motion to one for summary judgment.  Specifically, a court may properly consider documents that are

"explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citation omitted). The Complaint alleges:

> The day after the van incident, on November 21, 2017, Plaintiff filed a grievance with the Residential Grievance Office describing the van incident, and seeking damages.
>
> On December 1, 2017, Plaintiff submitted grievances to the Residential Grievances Office relating to the unsanitary and dangerous conditions of his cell.

(ECF No. 171, ¶¶ 83 and 93.)   Accordingly, the court may consider these grievances without converting the DPSCS Motion to one for summary judgment.   Of import, the court will not consider any other documentation related to the grievances in resolving the DPSCS Defendants' 12(b)(6) motion, as they are not expressly referenced in the complaint.

Notwithstanding the court's consideration of the above-described grievances, Plaintiff's Complaint does not satisfy the requirements of the MPLA.   The only "proof" Plaintiff provides (and not by attaching it to the Complaint) are grievances.   Plaintiff does not attach proof of the administrative decision.   Additionally, Plaintiff does not provide proof that he appealed the administrative decision to the appropriate authority.   Accordingly, Plaintiff's state law claims set forth in Counts IX and X will be dismissed because Plaintiff has failed to comply with the MPLA.

### 3.    Negligence— (Count X)

Plaintiff's negligence claim is premised on the November 20, 2017, van incident when an occupied van seat fell on Plaintiff's legs during a transfer.   The DPSCS Defendants argue that Plaintiff's negligence claim (Count X) should be dismissed, because (1) Defendant Powell is immune from suit; (2) Plaintiff's claim is barred by the statute of limitations; and (3) Plaintiff fails to state a claim for negligence.   (ECF No. 205-3 at 23.)   Although the court finds that Plaintiff's

negligence claim will be dismissed pursuant to the court's MPLA exhaustion analysis, for purposes

of completeness, the court will address the DPSCS Defendants' remaining arguments.

### a.      Immunity

The DPSCS Defendants argue that Plaintiff's negligence claim against Powell fails because

Powell is immune under the Maryland Tort Claims Act ("MTCA"), MD. CODE ANN., STATE GOV'T

("S.G.") §§ 12-101, *et seq.*  (ECF No. 205-3 at 23.)  Plaintiff asserts that Powell, the driver of the

van, knew there was an open work order for the van at the time of the incident.  (ECF No. 213 at

11.)  Plaintiff argues that Powell's knowledge of the work order suffices as "knowing and

deliberate wrongdoing," which defeats immunity.

Pursuant to the MTCA:

> (a) (1) Subject to the exclusions and limitations in this subtitle and
> notwithstanding any other provision of law, the immunity of the
> State and of its units is waived as to a tort action, in a court of the
> State, to the extent provided under paragraph (2) of this subsection.
> (2) The liability of the State and its units may not exceed $200,000
> to a single claimant for injuries arising from a single incident or
> occurrence.
>
> (b) Immunity is not waived under this section as described under §
> 5-522(a) of the Courts and Judicial Proceedings Article. . . .

S.G. § 12-104.

CJP § 5-522 provides:

> (a) Immunity of the State is not waived under § 12-104 of the State
> Government Article for:
>> (1) Punitive damages;
>>
>> (2) Interest before judgment;
>>
>> (3) A claim that arises from the combatant activities of the
>> State Militia during a state of emergency;
>>
>> (4) Any tortious act or omission of State personnel that:
>>> (i) Is not within the scope of the public duties of the
>>> State personnel; or

(ii) Is made with malice or gross negligence;

(5) A claim by an individual arising from a single incident or occurrence that exceeds $200,000; or

(6) A cause of action that law specifically prohibits.

(b) State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver . . . .

"When we read SG § 12-104 and CJP § 5-522 together, it is clear that State personnel are immunized for their tortious conduct committed within the scope of their public duties, unless that conduct was . . . committed 'with malice or gross negligence[.]'" *Rodriguez v. State*, 218 Md. App. 573, 615 (2014) (quoting CJP § 5-522(a)(4)(ii)). Maryland courts have consistently defined "malice" as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Barbre v. Pope*, 402 Md. 157, 182 (2007) (citations and quotation marks omitted).

In order to overcome MTCA immunity at the pleading stage, a complaint must "sufficiently allege[] malice or gross negligence." *Id.* at 181-82. "Plaintiffs face a high standard when pleading malice and conclusory allegations are insufficient." *McDaniel v. Maryland*, 2010 U.S. Dist. LEXIS 84784, 2010 WL 3260007, at *8 (D. Md. Aug. 18, 2010). "Merely asserting that an act was done maliciously, or without just cause, or illegally, or with wanton disregard, or recklessly, or for improper motive does not suffice." *Elliott v. Kupferman*, 58 Md. App. 510, 528 (1984). Instead, "[t]o overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious." *Id.*

Likewise, conclusory allegations of gross negligence are insufficient to overcome MCTA immunity at the Rule 12(b)(6) stage. *See Barbre*, 402 Md. at 188 (explaining "conclusory

allegations of gross negligence were not enough to bring the claim outside of the immunity and non-liability provisions of the MTCA").  Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them."  *Id.* at 187 (quoting *Liscombe v. Potomac Edison Co*., 303 Md. 619, 635 (1985)). Stated differently, "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."  *Id.*

The Complaint alleges:

> Defendant Charlene Powell drove the van recklessly and was forced to make a sharp turn into the BCBIC sally port.

> As a result, of the reckless driving, the stepping stool in the van hit Plaintiff's leg, and the row of seats in the van in front of the Plaintiff collapsed on his legs.

> Plaintiff later learned that at the time the seat collapsed on his legs, there was a work order for that specific van. He was told that, because of the work order, the van should not have even been in use, and that detainees should not have been transported in that van.

> This duty was breached when Defendants Nufea and Powell drove the van at an excess rate of speed, and therefore had to take sharp turns. These sharp turns caused one of the seats to collapse onto the Plaintiffs legs.

> This duty was also breached when Defendants Nufea and Powell drove Plaintiff and other inmates in a van that had an active work order and should not have been used to transport inmates.

(ECF No. 171, ¶¶ 72-73, 81, and 399-400.)

Here, Plaintiff does not allege facts to support a finding that Powell acted with malice or gross negligence.  Plaintiff alleges he was injured because Powell drove recklessly.  The Complaint lacks any allegation to support a conclusion that Powell's actions were "evil" or fueled by ill intent.

Even if Powell's driving was reckless, as alleged, that is insufficient to support a finding of malice. With respect to gross negligence, Plaintiff's allegations fare no better. Plaintiff does not allege facts to support a conclusion that Powell intentionally disregarded Plaintiff's life or liberty in the manner in which he is alleged to have driven the van. Additionally, although Plaintiff asserts (in his opposition) that Powell had knowledge of the van's work order at the time of the incident, the Complaint contains no such allegation. Accepting Plaintiff's Complaint allegations as true, there is no support for Plaintiff's position that Powell's knowledge of the work order coupled with "reckless" driving defeats MTCA immunity.

### b.      *Statute of Limitations*

The DPSCS Defendants argue that Plaintiff's negligence claim was brought more than five years after the alleged incident giving rise to the claim, and is, therefore, barred by the statute of limitations. (ECF No. 205-3 at 26.) Plaintiff asserts that claims related to the van incident appeared in the third amended complaint at ECF No. 84-1, which was filed on February 5, 2021. (ECF No. 213 at 13.) Plaintiff further avers that he attempted to raise claims related to the van incident in the proposed amended complaint filed on November 19, 2020 (ECF No. 64-1) alongside his motion for leave to amend, which was denied without prejudice at ECF No. 65. *Id.* Plaintiff argues that although the three-year statute of limitations lapsed by the time the third amended complaint was filed on February 5, 2021, he made every effort to include his claim before November 20, 2020. On this basis, Plaintiff argues the statute of limitations should be equitably tolled *nunc pro tunc*.

Normally, at the 12(b)(6) stage, the court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted). "[I]n the relatively rare circumstances where facts sufficient to

rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc*., 494 F.3d 458, 464 (4th Cir. 2007) (*en banc*).  "Because Rule 12(b)(6) 'is intended [only] to test the legal adequacy of the complaint,' '[t]his principle only applies . . . if all facts necessary to the affirmative defense clearly appear[ ] on the face of the complaint.'" *Rich v. Hersl,* 2021 U.S. Dist. LEXIS 118098, at *17 (D. Md. Jun. 24, 2021) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) and *Goodman*, 494 F.3d at 464) (citations omitted).  In Maryland "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."  CJP § 5-101. "Maryland's three-year statute of limitations for civil action applies to all negligence claims." *Evans v. Maryland-National Cap. Parks & Planning Comm'n*, 2023 WL 3328002, at *30 (D. Md. Mar. 31, 2023) (citing CJP § 5-101).

Based on the allegations in the Complaint, the van incident occurred on November 20, 2017, but, as Plaintiff concedes, none of his complaints mentioned the van incident until February 5, 2021, which is outside the limitations period.  That notwithstanding, Plaintiff's tolling arguments demonstrate that all the necessary facts are not apparent on the face of the Complaint. Therefore, it would be improper for the court to resolve this affirmative defense on a 12(b)(6) motion.  Further, the court declines to address Plaintiff's equitable tolling arguments in light of its finding that the negligence claim is properly subject to dismissal due to Plaintiff's failure to adhere to the exhaustion requirements of the MPLA.

### c.   *Failure to State a Claim*

The DPSCS Defendants also argue that Plaintiff fails to state a claim for negligence because the facts alleged do not support the requisite proximate cause and his injuries were not

foreseeable.  (ECF No. 205-3 at 27-28.)  Plaintiff counters that he has stated a *prima facie* case for

negligence against Powell.  (ECF No. 213 at 12.)

"To plead negligence in Maryland, a plaintiff must 'allege with certainty and definiteness,

facts and circumstances sufficient to set forth (a) a duty owed by the defendant to the plaintiff, (b)

a breach of that duty and (c) injury proximately resulting from that breach.'"  *Fletcher v. Md.*

*Transit Admin.*, 741 F. App'x 146, 149 (4th Cir. 2018) (quoting *Pace v. State*, 425 Md. 145, 154

(2012)).  "[I]n order to be found negligent, the negligence of the individual(s) must be a proximate

cause of the alleged harm."  *Copsey v. Park,* 453 Md. 141, 164 (2017) (citing *Stone v. Chicago*

*Title Ins. Co. of Md.*, 330 Md. 329, 337 (1993)).

> Proximate cause ultimately involves a conclusion that someone will
> be held legally responsible for the consequences of an act or
> omission. This determination is subject to considerations of fairness
> or social policy as well as mere causation. Thus, although an injury
> might not have occurred "but for" an antecedent act of the
> defendant, liability may not be imposed if for example the
> negligence of one person is merely passive and potential, while the
> negligence of another is the moving and effective cause of the
> injury.

*Peterson v. Underwood*, 258 Md. 9, 16 (1970).

In *Pittway Corp. v. Collins,* the Supreme Court of Maryland held that in order to be a

proximate cause of an injury, the alleged negligence must be (1) a cause in fact; and (2) a legally

cognizable cause.  *Pittway Corp. v. Collins*, 409 Md. 218, 243-45 (2009).  "Causation-in-fact

concerns the threshold inquiry of 'whether defendant's conduct actually produced an injury.'"  *Id.*

at 244 (quoting *Peterson v. Underwood*, 258 Md. 9, 16-17 (1970).  Under Maryland law, there

are two tests to "determine if causation in fact has been met: (1) the 'but for' test, which applies

when 'only one negligent act is at issue' and 'the injury would not have occurred absent or 'but

for' the defendant's negligent act,' and (2) the 'substantial factor' test, which applies when 'it is

more likely than not" that the defendant's negligent conduct was a substantial factor in bringing

about the injury." *Suesse v. Luecke,* 2019 Md. App. LEXIS 616 at \*26-27 (Jul. 25, 2019) (quoting

*Pittway Corp*., 409 Md. at 244).  "The 'but for' test applies in cases where only one negligent act

is at issue; cause-in-fact is found when the injury would not have occurred absent or 'but for' the

defendant's negligent act."  *Pittway Corp.,* 409 Md. at 244 (quoting *Peterson*, 258 Md. at 16).

"Once causation-in-fact is established, [] the proximate cause inquiry turns to whether the

defendant's negligent actions constitute a legally cognizable cause of the complainant's injuries."

*Pittway Corp.,* 409 Md. at 245.  "The question of legal causation most often involves a

determination of whether the injuries were a foreseeable result of the negligent conduct.  Other

public policy considerations that may play a role in determining legal causation include 'the

remoteness of the injury from the negligence [and] the extent to which the injury is out of

proportion to the negligent party's culpability . . . .'"  *Id.* at 246 (quoting Rory A. Valas, *Toxic

Palsgraf: Proving Causation When the Link Between Conduct and Injury Appears Highly

Extraordinary,* 18 B.C. Envtl. Aff. L. Rev. 773, 782 n.66 (1991)).

> In applying the test of foreseeability . . . it is well to keep in mind
> that it is simply intended to reflect current societal standards with
> respect to an acceptable nexus between the negligent act and the
> ensuing harm, and to avoid the attachment of liability where, in the
> language of Section 435(2) of the Restatement (Second) of
> Torts (1965), it appears "highly extraordinary" that the negligent
> conduct should have brought about the harm.

*Henley v. Prince George's Cnty.*, 305 Md. 320, 334 (1986).  "The defendant may not be liable if

it appears highly extraordinary and unforeseeable that the plaintiffs' injuries occurred as a result

of the defendants' alleged tortious conduct."  *Pittway Corp*, 409 Md. at 247.

"While proximate cause — both cause-in-fact and legal cause — analysis is reserved for

the trier of fact 'it becomes a question of law in cases where reasoning minds cannot differ.'"  *Id.*

at 253 (quoting *Segerman v. Jones*, 256 Md. 109, 135(1969)).  "It is well established that, 'unless

the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury." *Id.* (quoting *Caroline v. Reicher*, 269 Md. 125, 133 (1973)).   Because the issues of proximate cause and foreseeability are reserved for the trier of fact, coupled with the court's determination that the negligence claim shall be dismissed for failure to comply with the requirements of the MPLA, the court declines to reach the DPSCS Defendants' arguments regarding proximate cause.

## CONCLUSION

For the reasons set forth herein, by accompanying order, the Wexford Motion (ECF No. 173) is granted in part and denied in part as follows: granted as to Count VII against Defendants Wexford Health Sources, Inc., Oluyemi Abiodun, M.D., Mulugeta Akal, M.D., Munjaja Litell, NP, Lum Maximuangu, NP, and Olufemi Olawale, NP; denied as to Count VII against Defendants Kelly Bickford, RN, and Crystal Jamison, PA; and denied as to Count VIII.  The DPSCS Motion (ECF No. 205) is granted in part and denied in part as follows: granted as to Counts IX and X; and denied as to Counts I through VI.

        /s/

Julie R. Rubin
United States District Judge

January 3, 2024